UNITED STATES of America, Appellant,

v.

Robert J. SCIOS a/k/a Robert Schwartz.

No. 75–1619.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc May 26, 1977.

Decided July 21, 1978.

As Amended July 27, 1978.

Hamilton P. Fox, III, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Asst. U. S. Atty., and Barry W. Levine, Asst. U. S. Atty., Washington, D. C., at the time the brief was filed, were on the brief, for appellant.

Walter H. Fleischer, Washington, D. C., with whom Axel Kleiboemer, Washington, D. C., was on the brief, for appellee.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

Dissenting opinion filed by MacKINNON, Circuit Judge.

Dissenting opinion filed by ROBB, Circuit Judge.

Dissenting opinion filed by WILKEY, Circuit Judge, with whom TAMM, Circuit Judge, joins.

LEVENTHAL, Circuit Judge:

On June 28, 1974, defendant Robert J. Scios was indicted for unlawful interception of wire communications and related offenses.[1] By order of May 20, 1975, the district court suppressed the testimony of a potential witness, Thomas Massa, Jr., on the ground that Massa's testimony was the product of an illegal search.[2] The govern-

1. Defendant was indicted under 18 U.S.C. § 2511(1)(a) (unlawful interception of wire communications); 18 U.S.C. § 2511(1)(c) and (d) (disclosure and use of such unlawfully intercepted communications); and 18 U.S.C. § 2512(1)(a) (interstate transportation of wire communication interception devices).

2. In an opinion and order, issued Dec. 10, 1974, the district court held the search was illegal and suppressed "tangible evidence" and "oral statements" that derived from the search. The government did not appeal that order. On April 23, 1975, the government moved the district court to "elaborate" on its earlier order.

ment appealed that order, and on Aug. 23, 1976, a panel of this court reversed the district court order on the ground that the "taint" attaching to Massa's testimony by virtue of the illegal search had been "attenuated" sufficiently to permit introduction of the testimony at defendant Scios's trial.[3]

We have reheard the case en banc and concluded that the challenged testimony must be excluded as tainted by the illegal search.

## I. FACTUAL BACKGROUND

On Sept. 29, 1972, telephone linemen came upon electronic devices attached to the telephone lines of a pharmacy in Washington, D. C., known as Your Pharmacy Service. The FBI began an investigation, which led eventually to the defendant Scios, a licensed private investigator. A warrant for his arrest was issued on Feb. 15, 1974. The prosecuting attorney concluded that there was no basis for application for a search warrant, and no search warrant was sought.

FBI agents proceeded to Scios's residence in New York City and arrested him there. After Scios had been physically taken into custody and a gun had been removed from his desk, one of the agents looked around the room "for nothing in particular." His attention focused upon a credenza, located three or four feet in back of defendant's desk. On top of the credenza were about 60 file folders, in wire racks, labeled with vari-

ous projects Scios had worked on in his capacity as a private investigator. Defendant's access to the credenza was, according to FBI testimony, blocked by the presence of an FBI agent between defendant and the credenza. The trial court found that the credenza was beyond the area of defendant's immediate control.[4]

At this point one of the agents went to the credenza and removed a file folder labeled "Your Pharmacy Service"—the name of the pharmacy upon whose telephone lines the electronic devices had been found. The government contended that the label on this folder was in plain view of the agents. The court found as a fact to the contrary; rather, the agent had "bent over, read through the folders, and fingered them so that their labels could be read."[5]

The folder was found to contain various papers, including a credit card charge slip with Scios's name on it from a motel in Washington, D. C., and an itemized bill from the same motel, indicating "Mr. Massa" had registered for the room. These items bore the date July 26, 1972, which established a likely temporal link to the period of the wiretapping. Using the motel's record of telephone calls made from the room, the F.B.I. was able to locate in New York City the potential witness— Thomas Massa, Jr.

A subpoena was issued commanding Massa to appear before a grand jury in the District of Columbia.[6] Massa was initially

In response, the court on May 20, 1975, issued the order from which the government now appeals, ruling that Massa's testimony was inadmissible as the product of an illegal search. Defendant has taken the position that the second order of the district court was merely a clarification of the first—i. e., that Massa's testimony was ruled inadmissible on Dec. 10, 1974 —and that therefore the government's present appeal is barred by expiration of the 30-day period for taking an appeal, 18 U.S.C. § 3731. This issue was decided adversely to the defendant in the opinion and order issued by a panel of this court on Aug. 23, 1976. The panel held that the "oral statements" suppressed by the order of Dec. 10, 1974 were, like the "tangible evidence," evidence that had already been obtained and that was admissible on its own, such as anything Scios may have said at the

time of arrest. We adopt the reasoning of the panel on this point, and its decision that the order of Dec. 10 did not, therefore, determine the admissibility of Massa's testimony.

3. *U. S. v. Scios,* No. 75–1619 (D.C. Cir. Aug. 23, 1976).

4. Memorandum Opinion of District Court (filed Dec. 10, 1974), reproduced in Appellant's Br. at 34, 53.

5. Memorandum Opinion of District Court (filed Dec. 10, 1974), reproduced in Appellant's Br. at 34, 54.

6. There was some initial confusion between Thomas Massa, Sr. and Thomas Massa, Jr., both of whom resided at the New York City address to which the FBI had been led.

reluctant to speak to the prosecutor in Washington, but on the advice of his family he appeared, on May 5, 1974, in the prosecutor's office. Massa was told that preparations were being made to grant him immunity from prosecution for matters to which his grand jury testimony might relate. In his first appearance before the grand jury, before immunity had been granted, Massa refused to testify, asserting his privilege against self-incrimination.

On May 8, 1974, the District Judge issued an order directing Massa to testify—conferring appropriate immunity. Massa was again taken before the grand jury and again refused to testify, but then reluctantly acquiesced after Judge Hart's order was read to him. The indictment of Scios followed.

## II. PROCEEDINGS IN THE DISTRICT COURT

In October, 1974, defendant Scios moved the district court to suppress as evidence the file folder and its contents, as well as all evidence derived therefrom. He moved, in addition, to suppress all oral statements made by him at the time of arrest, and any evidence derived therefrom. On Dec. 10, 1974, the court granted these suppression motions. Its order was based on two alternative grounds. It ruled, first, that the affidavit in support of the warrant for Scios's arrest had failed to establish probable cause to believe that Scios had committed a crime; consequently, the challenged evidence was suppressed as the product of an illegal arrest. The court then assumed, *arguendo,* that the arrest *had* been lawful, and went on to hold that the seizure of the file folder was nevertheless illegal since the folder was not seized in a search incident to arrest as permitted under *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), nor was it in plain view. Neither defendant's motions to suppress nor the government's responses to these mo-

tions mentioned the testimony of the witness Massa.

On April 23, 1975, long after the period for appeal of the foregoing order had elapsed, the government moved the court for a determination of whether Massa's testimony was admissible at trial.[7] The government argued that the taint attaching to Massa's testimony by virtue of the illegal seizure of the folder had been attenuated by intervening events, contending particularly that there was attenuation in Massa's ultimate "act of volition" in deciding to testify. On May 20, 1974, the district court ruled that the taint had not been sufficiently attenuated to permit introduction of Massa's testimony.

## III. QUESTIONS PRESENTED

■ The district court's December 10, 1974, order holding the seizure was illegal was not appealed. On this appeal, from the April 23, 1975, order, suppressing Massa's testimony, the government does not contest the district court's ruling that the seizure was a violation of the fourth amendment.[8] It argues a claim of attenuation—that the taint attributable to the illegal seizure of the defendant's file folder has been sufficiently dissipated to permit introduction of the testimony of Thomas Massa, Jr., at trial.

■ The exclusionary rule was established in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The purpose of the rule is to safeguard fourth amendment rights. *United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The rule bars the introduction at trial not only of evidence seized in violation of the fourth amendment, but also of evidence obtained as an indirect result of the illegal seizure—the fruit of the poisoned tree. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Wong Sun v. United*

---

7. In this motion the government took the position that the admissibility of Massa's testimony had not been determined by the court's earlier order—a view disputed by defendant.

8. The position injected by Judge MacKinnon's opinion, that there was no violation of the fourth amendment, is in our view without merit. See note 15 *infra.*

*States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). An exception to this "tainted fruit" doctrine has been established for the case where the connection between the illegal seizure and the subsequent discovery of the challenged evidence has "become so attenuated as to dissipate the taint," *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). It is related to the rule, plainly not available to the government here, that permits the introduction of evidence to which the government was led by means independent of the illegal search or seizure.[9]

In certain circumstances, the attenuation doctrine has been applied where the witness who has been located as the result of an illegal search or seizure has voluntarily decided to testify. See *Wong Sun v. United States,* 371 U.S. at 491, 83 S.Ct. 407. The principle underlying this application of the attenuation doctrine has not been articulated with clarity. It is probably an adaptation, with adjustment, of the general legal conception that sees the link of causation broken when an intervening cause is independent.[10]

Turning to the case before us, we examine first the claim that the taint of the illegal seizure was attenuated by a voluntary decision to testify; and next, the claim of attenuation of the taint by the complexity of intervening factors.

A. Voluntariness: In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court excluded the incriminating statements of defendant Toy, made shortly after his illegal arrest, while handcuffed and surrounded by federal narcotics agents. The Court said it was unreasonable to judge that his response to the police interrogation "was sufficiently an act of free will to purge the primary taint" of an illegal arrest, 371 U.S. at 486, 83 S.Ct. at

416. The statement of Wong Sun, a co-defendant, was, by contrast, deemed admissible. Wong Sun had also been arrested without probable cause. His statement, however, was not made immediately after arrest; rather, he was released in his own recognizance and returned voluntarily several days later to make the statement. *Id.* at 491, 83 S.Ct. 407. The Supreme Court found that "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.' . . ." *Id.* at 491, 83 S.Ct. at 419, quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

■ It seems clear from *Wong Sun* that for an act of free will to operate as a dissipation of taint, it must occur in circumstances devoid of coercion.

The principle was further developed in *Smith and Bowden v. United States,* 117 U.S.App.D.C. 1, 324 F.2d 879 (1963), decided shortly after *Wong Sun.* This court excluded a statement made by a defendant during unnecessarily long post-arrest detention, and tangible evidence taken from him at that time. But it admitted the testimony of an eyewitness to a murder who had been located as a result of a statement made by a defendant. The eyewitness initially provided no incriminating evidence. After considering the matter for a period of time, during which he "kept thinking about the dead man . . .," Record at 629, he decided to testify against defendant. In support of the distinction thus made, Judge (now Chief Justice) Burger stressed the element of volition and other aspects of human behavior that contribute to its indeterminacy:

[A] witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, "speak for themselves." The proffer of a living witness is not to

---

9. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). There is no serious assertion by the government in the case before us that Massa would have been identified as a potential witness without the aid of the leads provided by the contents of the file folder.

10. Where the person who made the statement is the one against whom it is sought to be used, see, *e. g., Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), it can be argued that, by volunteering the statement after careful consideration, he has waived his objection to the illegal search or seizure.

be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personalty whose attributes of will, perception, memory and volition interact to determine what testimony he will give.[2] The uniqueness of this human

[2] This is illustrated here by the circumstance that when initially located Holman [the eyewitness] gave no information adverse to appellants; only after reflection and the interaction of these faculties of human personality did Holman eventually relate to the jury the events of the night of the killing. These factors in part account for the rule allowing a party to cross-examine his own witness on a claim of surprise and ultimately to impeach his own witness.

process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.

117 U.S.App.D.C. at 3–4 & n. 2, 324 F.2d at 881–82 & n. 2.

The concept of "reflection" as the key element of admissibility in *Smith and Bowden* was emphasized in *Smith and Anderson v. United States,* 120 U.S.App.D.C. 160, 344 F.2d 545 (1965).

However, for purposes of this case, we need not pursue the question when or in what circumstances voluntary testimony will be admissible.

■ In the present case, it is plain that Massa's giving of testimony—before the grand jury, and presumably at the trial—is purely and simply a product of coercion. Massa's decision to testify is not a matter of choice, or free will, but made solely to avoid being jailed for contempt. His decision to testify in such circumstances can hardly be what Judge Burger had in mind in *Smith and Bowden* when he spoke of the "human

11. Brief and Appendix for Appellant at 16.

12. *United States v. Alston,* 311 F.Supp. 296, 299 (D.D.C.1970) (restating the holding of *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)).

13. *United States v. Tane,* 329 F.2d 848, 853 (2d Cir. 1964). See also *United States v. Karathanos,* 531 F.2d 26, 32–35 (2d Cir. 1976).

personality whose attributes of will, perception, memory and *volition* interact to determine what testimony he will give." 117 U.S.App.D.C. at 3, 324 F.2d at 881.

B. Claim of attenuation of the taint by intervening factors: The government also argues there are numerous "intervening factors" [11] between the illegal seizure of the file folder and Massa's testimony making the chain from the illegal seizure of the file folder to the testimony of Massa "so complicated, remote, and indirect" [12] as to dissipate the connection.

■ The claim, in substance, is that there was no direct link between the file folder and Massa, because the file document that showed Massa's name in the record of the motel room paid by defendant did not establish his identity. That only appeared when the police checked the motel's telephone records.

■ We must begin with the illegal search. At the arrest for the offense of tapping the line of Your Pharmacy Service, the agent unlawfully riffled through defendant's file folders and removed his file for Your Pharmacy Service. The agents tracked the Massa lead found in that file. They did not pursue a trail independent of the illegal search (see note 9). The location of Massa was not the product of an improbable, unforeseeable coincidence. It was good police work, but a straightforward exploration of the leads in the Pharmacy file. The fact that the exploration took some time, although a material consideration, does not of itself demonstrate that the exclusionary rule is inapplicable. "The road . . . may be long, but it is straight." [13]

\*   \*   \*   \*   \*   \*

*United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), discussed more fully below, is not to the contrary. The Court there indicated, *inter alia,* that the period of time that has elapsed between the time of the illegal search and the discovery of a witness, or his testimony at trial, is one of several factors to be considered in determining whether the taint occasioned by the illegality has been attenuated. *Id.* at 279, 98 S.Ct. 1054. Here the elapsed time was, admittedly, not in-

We add to the opinion that had been written for this case a reference to *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), which in our view is not only congruent with but affirmatively supports our reasoning and result.

In *Ceccolini*, a police officer (Biro), on duty at school crossings, was taking a break in defendant's flower shop, when he noticed an envelope, with money sticking out, on the cash register behind the counter. He examined the contents of the envelope, found policy slips, and questioned a shop employee (Ms. Hennessey) who told him that the envelope belonged to defendant, and that he had instructed her to give it to someone. Some four months later, the FBI interviewed her at her home in the presence of her family, and said the government would appreciate any information regarding defendant's activities that she had acquired in the shop. She told the FBI agent she was studying police science in college and would be willing to help, and she then related the events that had occurred when the police officer was at the shop. A month later she testified to the same effect before the grand jury, thus contradicting the grand jury testimony given by defendant, who was indicted for perjury.

The Supreme Court held that the testimony of employee Hennessey was admissible at defendant's trial.

Justice Rehnquist, for the Court, found that the taint of the illegal search by the officer had been sufficiently attenuated to permit introduction of the testimony. The Court rejected the notion that the exclusionary rule was subject to a *per se* exception that rendered all live witness testimony admissible, regardless of whether obtained as a consequence of illegality.[14] Instead, the particular features of a case must be examined to balance the benefits of the exclusionary rule, with its deterrent purpose, against the costs.

In his summarizing paragraph Justice Rehnquist states:

Viewing this case in the light of the principles just discussed, we hold that the Court of Appeals erred in holding that the degree of attenuation was not sufficient to dissipate the connection between the illegality and the testimony. The evidence indicates overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips. Nor were the slips themselves used

significant. But it is far outweighed by the other considerations set forth in *Ceccolini.* See pp. —— — —— of —— U.S.App.D.C., pp. 962–963 of 590 F.2d *infra.*

*Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), cited by Judge Wilkey, is not in point. Johnson was arrested without a warrant, and detained under a magistrate's commitment. While under detention he was identified in a lineup. He argued that the lineup identification was a forbidden fruit of an arrest that violated his fourth amendment rights. The Court held (p. 365, 92 S.Ct. p. 1626): "At the time of the lineup, the detention of the appellant was under the authority of this commitment. Consequently, the lineup was conducted not by 'exploitation' of the challenged arrest but 'by means sufficiently distinguishable to be purged of the primary taint.'"

The premise underlying *Johnson* is the historic doctrine that the victim of an illegal arrest cannot on that ground attack a subsequent detention or other processes of criminal justice. *See Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); E. C. Fisher, Laws of Arrest (1976) §§ 181, 182. Ob-

viously, if the victim of an illegal arrest were released, he could be rearrested and committed by a magistrate upon a finding of probable cause, and would not thereafter be immune from any criminal proceeding. A lineup identification may be compelled as a corollary of a current detention by the magistrate, which stands on ground that is independent of the arrest (valid or invalid), and may not properly be considered the fruit of the earlier (allegedly invalid) arrest. As to the present case, there is no historic rule like that which establishes the magistrate's commitment as resting on an independent cause. The court order compelling testimony from Massa is necessarily rooted in the discovery of Massa through an illegal search.

14. Accordingly, we shall not respond to the discourse in Judge Wilkey's dissent supplying us with a discussion of the virtues of such an exception. The case reports are already too long, and our time too short, for our ruminations on an issue so recently and squarely addressed and resolved.

in questioning Hennessey. Substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other. While the particular knowledge to which Hennessey testified at trial can be logically traced back to Biro's discovery of the policy slips, both the identity of Hennessey and her relationship with the respondent was well known to those investigating the case. There is, in addition, not the slightest evidence to suggest that Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as Biro. The cost of permanently silencing Hennessey is too great for an even-handed system of law enforcement to bear in order to secure such a specula-

tive and very likely negligible deterrent effect.

435 U.S. at 279, 98 S.Ct. at 1062.

The case at bar stands in marked contrast to *Ceccolini* on these critical factors: (1) In *Ceccolini*, Hennessey's testimony "was an act of her own free will in no way coerced or even induced by official authority." In contrast, Massa initially refused to consult with the authorities, and agreed to confer and to testify only in response to pressure by the prosecutor, including the threat of a contempt citation.

(2) Massa's existence as a potential witness was entirely unknown to the authorities before they searched Scios's files.

(3) The search of Scios's files was to gain evidence, the FBI having come to the scene to arrest Scios for illegal wiretapping.

Excluding the fruit of that illegal search cannot be dismissed as of "negligible deterrent effect."

\*   \*   \*   \*   \*   \*

▆▆▆ We conclude, in sum, that the taint of the illegal search and seizure of the folder [15] was not dissipated by the fact that

---

**15.** Two dissenting opinions argue that the seizure of the file folder was permissible under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), or under the plain view doctrine.

*Plain View Doctrine*

The folder was not in plain view. Agent Swayze testified that after he had conducted a search for weapons, and after Scios had been arrested, "I started to read up the various files that were in these little wire stands." (Swayze Tr. 18.) It had previously been testified that these were on a "counter top" (referred to by others as a credenza). "There were about 60 or 70 files in these two or three wire stands . . . and these files were stacked one right behind the other." (Swayze Tr. 18.) He testified that he "did not thumb through the files" and did not "leaf through them." (Swayze Tr. 19.) He acknowledged that the particular file was not "sticking out" and that it was "somewhere in the middle of the stack of files with about "ten, fifteen . . . in front of this particular file." (Swayze Tr. 21.)

When he saw the "Your Pharmacy" file, he pulled it out and said to agent Breen, "Isn't this the company involved in this thing?" (Swayze Tr. 21.) The trial judge summarized the testimony of Mr. Scios that Swayze "thumbed through the file folders." The trial judge did

not credit the testimony of agent Swayze that he did not finger through the files. In a memorandum opinion rejecting the applicability of the plain view doctrine, the trial judge ruled: "The court heard conflicting testimony concerning seizure of the file folder. In resolving this conflict the court concludes that the discovery of the file folder was not inadvertent; rather, the agent bent over, read through the folders, and *fingered them so that their labels could be read.*" (Emphasis added.)

*Chimel Doctrine*

In *Chimel,* the Court limited the area of permissible warrantless search to the area of "immediate control" of the person arrested. In formulating this rule, the Court observed that it certainly precludes the search of another room, as beyond the area of immediate control. From this, Judge MacKinnon seems to argue that *Chimel* blesses a warrantless search that is made within the same room. The fallacy is evident.

Judge MacKinnon also urges that the search was legitimated by the fact that Mr. Scios may have had access to the file folder at certain times prior to the search. In attempting to demonstrate such access, he purports to reconstruct facts that were not genuinely explored at trial. More importantly, such prior access, if it

police investigation of the leads in the folder was required in order to locate Massa, or that Massa decided to testify under the constraint of a court order. We therefore affirm the order of the district court suppressing his testimony.

*So ordered.*

MacKINNON, Circuit Judge, dissenting:

Scios, a private investigator who was known to the FBI to be a "wiretapper and bugger," resided in Staten Island, New York. He was hired by the owners of "Your Pharmacy, Inc." located in the District of Columbia, to discover the source of some losses the drugstore was suffering. Some time later he was arrested in New York on a warrant issued in the District of Columbia for alleged wire tapping in connection with the "Pharmacy" investigation. At the time of the arrest the possibility of obtaining a search warrant was discussed between the FBI agents and the U.S. Attorney in New York, but they decided that they were not possessed of sufficient facts to justify the issuance of such warrant.

When Scios was eventually arrested in his home, in a small office to which, at his suggestion, he led the agents (Tr. III, 12–13, 45–46),* a file entitled "Your Pharmacy Service" was seized which contained incrim-

inating evidence. One document obtained from this file was used by the FBI to track down a material witness, one Massa, who apparently is able to inculpate Scios in the crimes with which he is charged. However, the trial court granted Scios' motion to suppress the testimony of said Massa on the ground that his testimony was directly attributable to the information contained in the file folder which the court found to have been obtained by the arresting agents as the result of an unlawful seizure. The Government by this appeal seeks to reverse the suppression order on the ground that the "taint" on the testimony of Massa has been sufficiently attenuated to avoid its rejection on the ground that it was the fruit of an unlawful seizure, *see Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In my view, we need not reach the attenuation argument because the testimony of record clearly indicates that the so-called search and seizure which accompanied the exercise of the arrest warrant at Scios' home was reasonable and conformed to the Fourth Amendment, and to the decisions of the Supreme Court thereon, particularly its landmark decision in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and the "plain view" doctrine, *e. g., Coolidge v. New*

---

existed, is in any event immaterial, under the holding and rationale of *Chimel,* as a justification for search.

The trial judge found: "In this case, even if the FBI version is believed, the defendant was seated at his desk and had been disarmed. There were three FBI agents in the room, including one who blocked defendant's immediate control . . . ." The findings are incontrovertible, and they establish the inapplicability of the doctrine under which *Chimel* authorizes certain searches.

That it was not possible for defendant to snatch and destroy the folder appears from agent Swayze's undisputed testimony that he was physically blocking defendant's access. Mr. Scios, who did not know what his visitors wanted, invited them into his office "to discuss whatever it was we were there to talk about" (Swayze Tr. 11.) When Mr. Scios entered the office, he "sat down at his desk"; agent Swayze positioned himself "between the desk and the wall" facing Scios; the counter top was behind the agent, and "yes, I was physically blocking . . . Mr. Scios' access to those

files." (Swayze Tr. 15.) Then agent Breen notified Mr. Scios of the arrest warrant and advised him of his rights; the agents searched for weapons; and agent Swayze, having established that there were no weapons in the desk drawer, turned around and saw the files. While agent Breen was explaining the arrest mechanics to Mr. Scios, agent Swayze "casually looked about the room" and "started to read up the various files that were in these little wire stands." (Swayze Tr. 18.)

Agent Swayze's blocking of the files was not a mere "momentary presence" at the time of seizure (Judge Robb's phrase). It identified the relative positions of the persons during the full episode of arrest, notification of rights, and search for weapons as well as the subsequent search and seizure.

* At the suppression hearing there were three separate transcripts, which will hereafter be designated as follows: Defendant Scios (Tr. I); FBI Agent Breen (Tr. II); FBI Agent Swayze (Tr. III).

*Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

## I. SEARCHES AUTHORIZED BY CHIMEL

The attenuation argument presupposes that the initial search and seizure of the "Your Pharmacy" file was illegal under *Chimel,* a recent decision which established the permissible scope of certain searches incident to arrest. This presupposition has caused me to review *Chimel* and its progeny as well as the testimony in the suppression hearing in the District Court. Such inquiry has convinced me that the parties and the trial court are misreading *Chimel* and the "plain view" doctrine, and that the facts of this case indicate the search and seizure of the file in question conformed to the applicable principles laid down by the Supreme Court.[1]

The controlling language of *Chimel* states:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, *it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach* in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. *There is ample justification, therefore, for a search of* the arrestee's person and *the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of* a weapon or *destructible evidence.*

There is no comparable justification, however, for routinely searching *any room other than that in which an arrest occurs* —or, for that matter, for searching through *all* the desk drawers or other *closed* or *concealed areas in that room itself.* Such searches, *in the absence of well-recognized exceptions,* may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

395 U.S. at 762–63, 89 S.Ct. at 2040 (emphasis added, footnote omitted).

Several observations should be made from the foregoing language. First, while it does refer to searches to protect the arresting officers, it is not limited to protective or security searches. It likewise authorizes certain searches for evidence that can be *concealed or destroyed.* Actually, protective searches may be more expansive.[2]

---

1. The "plain view" doctrine is completely compatible with *Chimel.* As Mr. Justice Stewart, who also wrote *Chimel,* remarked in *Coolidge v. New Hampshire,* after quoting *Chimel:*

   Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee.

   403 U.S. at 466 n.24, 91 S.Ct. at 2038.

2. *United States v. Bowdach,* 561 F.2d 1160, 1168–69 (5th Cir. 1977):

   The law in this circuit holds that police officers have a right to conduct a quick and cursory check of a residence when they have reasonable grounds to believe that there are other persons present inside the residence who might present a security risk. . . . The exigent circumstances presented by this reasonable fear of violence distinguishes this factual setting from *Chimel v. California*

   . . . .

   *United States v. Mulligan,* 488 F.2d 732, 735 (9th Cir. 1973), *cert. denied,* 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974):

   The search here [throughout the house] was to protect the agents from possible harm. The latter type of search is expressly condoned by *Chimel* . . . .

   *Hopkins v. State of Alabama,* 524 F.2d 473, 475 (5th Cir. 1975):

   Both [*Vale* [*Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970)] and *Chimel* ] are distinguishable from the facts

Second, it merely states that searches within the stated limits are "reasonable" and does not state that under certain different conditions more extensive or different searches might not also be reasonable. Third, it *authorizes* a "search of the person arrested." Fourth, it *authorizes* a search of "the area into which an arrestee might reach in order to grab a weapon or *evidentiary items* . . . ," i. e., "the area 'within his immediate control' .· . . from within which he might gain possession of a weapon or destructible evidence." (Emphasis added.) Fifth, the basis for authorizing the foregoing routine searches, *i. e.,* security of the officers and *preservation of destructible evidence,* does not authorize "routinely searching any room *other than that in which an arrest occurs* . . . ." Sixth, that the *routine* search of the room "in which an arrest occurs," to the extent that such search *may* have been authorized by *Chimel,* is a limited search which does not constitute authority "for searching through *all* the desk drawers, or other closed or concealed areas in that room itself." It is not necessary here to determine the full extent of the search thus authorized because the instant search was not that exten-

sive. Seventh, even more extended searches could be made in accordance with "well recognized exceptions." Thus, *Chimel* indicates that the controlling principle to be applied in determining their validity is still the reasonableness of the search.

*Chimel* clearly recognizes the right to search for evidence. *See, e. g., United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) [3]; *United States v. Collins,* 532 F.2d 79 (8th Cir.), *cert. denied,* 429 U.S. 836, 97 S.Ct. 104, 50 L.Ed.2d 102 (1976); *United States v. Carter,* 173 U.S.App.D.C. 54, 522 F.2d 666 (1975); *United States v. Battle,* 166 U.S.App.D.C. 396, 510 F.2d 776 (1975). In recognizing the validity of intrusions to discover evidence, the decision appears to decide that the areas which may be searched for weapons and for destructible evidence are virtually coextensive with each other. Yet, in my view, the parties and the court have given too short shrift to the permissible evidentiary search in evaluating the legality of the seizure of the "Your Pharmacy" file. It also appears that adequate consideration was not given to the fact that *Chimel* explicitly recognizes that "a room in which an arrest occurs"

presented here. *Vale* involved a search for narcotics and *Chimel* for evidence relating to the burglary of a coin shop. Neither case presented the exigent circumstances and fact setting shown in this case. . . . The immediate need to ensure that no one remained in the house preparing to fire the yet unfound weapon obviously justified the warrantless search.

*United States v. Hobson,* 519 F.2d 765, 776 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975):

Chimel was intended to prevent officers from using an arrest as a pretext for ransacking a defendant's house in the search for evidence. Clearly, where the house is reputed to contain an arsenal of weapons and people who know how to use them and have expressed an intent to do so, some protective measures are in order. . . . It was entirely proper to search each room for additional persons and weapons.

*United States v. Smith,* 515 F.2d 1028, 1031 (5th Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 322 (1976) is to the same effect.

**3.** In *Robinson,* the Supreme Court held that in the case of a lawful, custodial arrest the police

could make a full search of the prisoner's person whether or not there was reason to suspect that the arrestee was armed or in possession of destructible evidence. This decision suggests, and was chided by the dissent for suggesting, that the guidelines established in *Chimel* for the acceptable scope of a search incident to arrest could be applied without regard for whether there was, in the particular circumstances of the specific case, any plausibility in the claim that the arrestee might be able to reach weapons or destructible evidence. By the same token that Robinson's person could be searched even though the underlying *Chimel* rationale of preventing the prisoner obtaining destructible evidence or a weapon was inapplicable, the police in this case should have been allowed to conduct a limited search of material situated in that area of the room immediately adjacent to Scios—provided they did not rifle through "all the desk drawers or other closed or concealed areas"—even though such material was slightly beyond Scios' reach when *seated* behind the desk. This would be a separate basis for the search in addition to the plain view doctrine and to the fact that the file *was* within arm's length reach of Scios when he entered the room immediately prior to the search.

may "routinely" be subject to a search, to the extent that it is "within his [the arrestee's] immediate control," if the officers involved exercise restraint and do not go "through *all* the desk drawers or other closed or concealed areas in that room itself." (Emphasis added.) The majority gives crabbed recognition, ante n.15, to the "ample justification" that the *Chimel* Court finds for the limited searching of the area "within [the arrestee's] immediate control" in the "room in which an arrest occurs."

*Chimel* authorizes a search incident to an arrest of "the area within [the arrestee's] reach . . . ." 395 U.S. at 766, 89 S.Ct. at 2042. Elsewhere the Court describes it as

> the area from which the [arrestee] *might have obtained* either a weapon or *something that could be used as evidence against him.*

395 U.S. at 768, 89 S.Ct. at 2043 (emphasis added).

There is no requirement in *Chimel* or any other case that the Government must prove as a prerequisite to a valid search, as the majority argues, that the presence of the accused created a "danger" that he would "snatch and destroy" the evidence or that the agent seized the evidence under threat of its immediate destruction. It is sufficient that the "evidence" was situated within an *area* which would permit the accused so to act if he were of a mind to do so. *Cf.* Maj. op. n.15. And the arm's length search that is *authorized* is not strictly limited to absolutely no more than the seated or stationary reach of the person being arrested—the majority misread the record when it construes the search as being limited to that point in time during which Scios was seated or stationary. Any reasonable interpretation of *Chimel* would include in the permissible search area that area within which the arrestee could reach after taking one step, as most people do when they reach. As the record here indicates, "with a slight body movement" (Tr. III, 48).

In light of the foregoing overview of the constitutionally permissible scope of warrantless searches incident to arrest on a warrant, we turn to the relevant facts as reported at the suppression hearing. The principal facts to be extracted from the testimony there received relate to the proximity of Scios to the "Your Pharmacy Service" file during the time he was in his office, as under some of the issues raised this geographical proximity is largely dispositive of whether or not the file was "within [Scios'] immediate control" or his "reach" and thus legitimately searched by the police. There is unequivocal evidence in the record indicating that the file was indeed within Scios' "immediate control" and at certain times within his "reach" and it was thus clearly erroneous for the trial court to find that the search extended beyond the limits permitted by *Chimel*.[4]

In this case, as a preliminary matter, it needs to be noted that there can be no legitimate question but that the file and its contents were destructible evidence. The statement by the trial court to the contrary—perhaps prompted by a confusion with contraband—is clearly erroneous. It is significant that the majority do not support the trial court on this point. This error alone is sufficient to reverse the trial court.

Also, destructible evidence need not be destructible *instantaneously*. The destructibility of the "Pharmacy" file is apparent from a cursory examination of its contents. The file is Government Exhibit I. An examination discloses that it is a small light brown manila folder $11\frac{1}{2}'' \times 9''$ with a tab $3\frac{3}{4}''$ long that protrudes $\frac{7}{16}$ths of an inch above the top edge at the left corner. It contained papers on which were printing, writing and typing. Included was a bill of the Royal Motel in Washington, D.C. This single bill constituted a major contribution of allegedly inculpating evidence. The re-

4. While it is not necessary to my conclusion in this case, it is my view that "immediate control" must be interpreted to mean that control which excludes the restraining influence and permissible control of arresting officers. Otherwise, since the arrest and presence of the officers could be construed to deprive the suspect of all mobility and control, the words would be meaningless. No area could be searched if normal control was not intended.

maining contents of the file consisted of six sheets of $9 \times 11\frac{1}{2}$ papers, some with writing and some with typing, five scratch sheets, two used envelopes, two calling cards and one duplicate original of a dealer's special use certificate issued by the Department of Motor Vehicles of the District of Columbia, and one ordinary street map of Washington, D.C.

It is well settled that searches incident to an arrest can discover documents as well as other forms of evidence, *United States v. Simpson,* 453 F.2d 1028 (10th Cir.), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2504, 33 L.Ed.2d 337 (1972); *United States v. Kirschenblatt,* 16 F.2d 202 (2d Cir. 1926), and the documents in question here, being easily destructible, were manifestly within the search authorized by *Chimel,* provided that they can legitimately be described as "within the area of the defendant's immediate control," or within his "reach," or as having been within one of the exceptions (plain view) which the decision contemplated.

The trial court found that the files in question were not within Scios' "immediate control," stating:

In this case, even if the FBI version is believed, the defendant was seated at his desk and had been disarmed. There were three FBI agents in the room, including one who blocked defendant's access to the credenza. The credenza was *not within defendant's immediate control,*[5] the agents testified they sought no other weapons, and the agents could not have been seeking to protect destructible evidence since there was none.[6] . . .

The Court in *Chimel* stated:

There is no . . . justification . . . for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. *Id.* [395 U.S.] at 763 [89 S.Ct. 2034].

The court concludes that a search of the credenza or through the file folders would have exceeded the permissible scope under *Chimel* and any evidence found in such a search would have to be suppressed.

Appellant's Br., App. at 53 (emphasis added). This analysis proceeds from the premise that in this case the area "within defendant's immediate control" is to be determined by what was within his "reach" *solely* at that moment in time when "the defendant was seated at his desk and had been disarmed," and when "defendant's access to the credenza" was blocked by one of the three FBI agents in the room. The statement that the agent blocked him may well be accurate, but in restricting its analysis to his permissible "reach" solely at that moment and to a limited view of the facts concerning "defendant's access," the court was applying an unduly restrictive reading of *Chimel.*

Further, review of the record reveals that the uncontradicted testimony of all parties establishes the fact, completely ignored by the defendant and the trial court, that Scios passed within less than arm's length reach of the file folder when he entered his office and seated himself at his desk (Tr. I, 17–18). The file was then within his "immediate control" and his proximity to it at that time alone justified its seizure, *e. g., United States v. Mason,* 173 U.S.App.D.C. 173, 523 F.2d 1122 (1975); *United States v. Patterson,* 447 F.2d 424 (10th Cir. 1971), *cert. denied,* 404 U.S. 1064, 92 S.Ct. 748, 30 L.Ed.2d 752 (1972); *United States v. Wysocki,* 457 F.2d 1155 (5th Cir.), *cert. denied,* 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972), which followed shortly thereafter. *See* Maj. op. n.15.

Scios also, on his own volition, and without being commanded to or hindered from doing so, got up and moved around the room after his arrest to go to the office

---

5. The trial court erred in concluding that the area "within defendant's immediate control" was to be restricted to the area that he could control while "*seated* at his desk" *after* he had just passed the credenza.

6. The finding that the file was not "destructible evidence" was clearly erroneous.

door and to come back (Tr. I, 19). On these occasions, he walked through a passageway of only "about three feet" (Tr. I, 77) between the desk and the credenza upon which the "Pharmacy" file folder was located. Scios was *not* handcuffed when he first walked into his office (Tr. I, 17–18), when he subsequently "went to the office door" to let out a neighbor's dog, or when he then "walked back around [his] desk and . . sat down" (Tr. I, 19). During these three personal peregrinations past the credenza, Defendant's Exhibits 3L and 3M show that the file folder was easily within his reach without need of even moving his hand appreciably away from his sides. Thus, on the occasion when he first entered the office, the "Your Pharmacy" file was clearly within his "reach" and also within "his immediate control," and during the two subsequent trips he was in similar proximity to the place where the file was originally situated. Scios' testimony (Tr. I, 17–19) and his Exhibit 3L, prove that the file was within his reach and "immediate control" on each of those occasions. The agent was "fingering through those files" at this precise time (Tr. I, 17). Scios' proximity to the file on those three occasions is all that is necessary to validate the instant search and seizure. The majority is thus in error when it characterizes Scios' access on these three occasions as "prior access," *see ante,* n.15—it was access reasonably contemporaneous to the search.

It is a completely incorrect application of *Chimel* to deny that the file was under his "immediate control," or "within his reach" when he walked past the credenza. That he thereafter seated himself behind the desk, with an agent between him and the credenza, does not invalidate the agent's right to explore the files in open view on the credenza which had been within his reach on the three occasions referred to. We are not confronted here with the general exploratory search that *Chimel* forbids. We have specifically held that an object within three or four feet of a defendant was "within his immediate control" even when the defendant was handcuffed, *United States v. Mason, supra.* The distance between Scios and his files was less than that on the three occasions when he walked by the credenza and the file was just slightly beyond that when he was seated.

When the arresting officer was actually interposed between Scios and the files, it would be reasonable to conclude that Scios would not actually exercise *physical* control over the documents. However, if the agents were not present, the proximity of the files though slightly beyond his stationary reach when seated, was so close that it could reasonably be said that they were within the area of his immediate control. *See* Defendant's Exhibits 3L and 3M. Exhibit 3L is reproduced at this point as Figure 1. (In viewing it the distortions of perspective should be compensated for.)

The trial court, however, entirely overlooked the fact that Scios was not always separated from his files by more than an arm's reach of distance. The majority also fail to deal with the significance of Scios' easy access to the file on the three occasions prior to the seizure. In addition the majority attempt to assert a requirement that it must have been possible for Scios to "snatch and destroy" the file when the agents seized it. *See* Maj. op. n.15. Moreover, *Chimel* does not impose any such requirement but is somewhat broader and covers evidence that is subject to "*concealment or destruction*." 395 U.S. at 762–63, 89 S.Ct. 2034.

The "concealment or destruction" that *Chimel* refers to is not confined to proof that the arrestee was capable of concealing and destroying the evidence in the presence of the arresting agents. In this respect and in others the majority misapply *Chimel*, Maj. op. n.15. Most egregiously the majority assert the logic that "it was not possible for defendant to snatch and destroy the folder [because Agent Swayze] was physically blocking defendant's access [to the file]." Such contention fails fully to understand the "destruction" of evidence that *Chimel* seeks to guard against and the application of *Chimel* to this case. *Chimel* authorizes a search of the permissible area for "a weapon or evidentiary items . . . in order to prevent [their] concealment or destruction." The "destruction" so referred to is not limited to a threat of *present* destruction while the agents are present. It also includes *future* destruction.

Thus, as applied here, the fact that the agents may have been physically capable of *temporarily* preventing Scios from destroying the file, while all three of them were in the room, is not the sole opportunity for destruction that *Chimel* recognizes should be prevented. In addition *Chimel* intends to guard against the *later* destruction of the file that could easily occur if it were not seized when it was discovered. If the agents were prohibited from seizing the file when it was discovered the alternative would be to leave it in the office. Some might argue that some of the agents could stay there while others went for a search warrant, but if the business that authorized their entry was concluded and a search warrant was required before they could proceed further, strictly speaking they would have no further right to remain in the building after the arrest was made. They would thus be required to leave and find a magistrate to issue a search warrant. After they left, Scios' partner, who could be reached by their shortwave radio (Tr. III, 26), or his "girlfriend" (Tr. I, 15), who was in the house, could destroy the file. Scios' temporary inability to destroy or conceal the file while the agents were present does not deny the agents' right to seize destructible evidence that could be subjected to *future* destruction or concealment. As we observed in *United States v. Thweatt,* 140 U.S.App.D.C. 120, 433 F.2d 1226 (1970):

> We might add that obviousness is a form of exigency in the sense that failure to act immediately when confronted with evidence in this manner may result in its disappearance.

140 U.S.App.D.C. at 125, 433 F.2d at 1231. In addition, *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1940) and *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) both recognize the exigency created when the opportunity to search is "fleeting" and the evidence "may never be found again if a warrant must be obtained." 403 U.S. at 460, 91 S.Ct. at 2035. To the same effect, *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) states:

> Such searches [pursuant to custodial arrests] may be conducted without a warrant and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon *or is about to destroy evidence.*

(Emphasis added.) Quoted in *United States v. Foster, Stafford & Prince,* 190 U.S.App. D.C. ——— at ———, 584 F.2d 997 at 1002 (1978).

We have recognized that arresting agents who have no search warrant cannot lead arrestees from place to place inside houses and apartments and use his presence at each location to justify a search incident to the arrest, but when the arrestee on his own volition, or at his own request, moves around the scene of the arrest, he brings within his immediate control a wider area that may be subjected to a valid search. *United States v. Mason, supra; United States v. Patterson, supra.* Given the extremely small size of the room in which the defendant was arrested—"maybe eight by eight" (Tr. III, 13)—the defendant's photographic Exhibits 3L and 3M show that one standing behind the center of Scios' desk could touch opposing walls by merely taking one step in either direction (*see* reproduced Defendant's Exhibit 3L). And because the agents in this case made no search beyond Scios' reach or his immediate control, and even within that area made no attempt at a general search or even to "search through all the desk drawers or other closed or concealed areas in that room itself," *Chimel v. California, supra,* 395 U.S. at 763, 89 S.Ct. at 2040, I find that the search was reasonable in scope and I cannot agree that it was unconstitutional. Thus the first ground upon which this search may be found to be valid is that the file, when Scios first entered the room, and shortly thereafter on two occasions, was easily "within [his] reach" and within that area which could reasonably be said to be normally within the area of his "immediate control." *See* Maj. op. n.15.

Other circuits have not restricted searches to the wooden interpretation of *Chimel* asserted by the majority. After all, the Constitution permits "reasonable" searches. *United States v. Patterson, supra,* upheld the seizure of a "partially hidden [file] folder or envelope sitting on a shelf *in* a cabinet . . . four to six feet away from where [the arrestee] was standing at the time."[7] (Emphasis added.) "Immediate control" and plain view were both relied upon. In *United States v. Wysocki, supra,* a suspicious *closed* box "six feet from Wysocki" (obviously out of a strict stationary arm's reach) was opened by agents investigating a bank robbery believing it contained a gun. It did *not* contain any weapon but some stolen money orders from the bank robbery were discovered. This search incident to an arrest without a

---

7. *United States v. Patterson,* 447 F.2d 424 (10th Cir. 1971), *cert. denied,* 404 U.S. 1064, 92 S.Ct. 748, 30 L.Ed.2d 752 (1972). An arrest warrant issued in connection with a forgery was served on Patterson in her apartment at a time when she and her husband were in the living room. No general search was undertaken:

> In the process of making the arrest, one of the police detectives went into the kitchen where he saw a partially hidden folder or envelope sitting on a shelf in a cabinet. The cabinet was *four to six feet away* from where Mrs. Patterson was standing at the time. The folder was in partial view of the detective because the cabinet door was about halfway open. The detective removed the folder from the cabinet against Mrs. Patterson's protests and found, among other things, [relevant evidentiary articles] . . . . The detective testified he was searching for a pistol since he knew Mrs. Patterson was a suspect in the burglary of Mudrick's apartment and this was one of the items taken.

447 F.2d at 425–26 (emphasis added).

> Appellant's position here is that Mrs. Patterson's arrest occurring in the living room would thereby limit the search to only that room. The record discloses that Mrs. Patterson, of her own volition, had moved to the doorway between the kitchen-dining room area and the living room. Access to the kitchen-dining room area was available to her by merely turning around. This justified the detective's precautionary measure of entering the kitchen.

447 F.2d at 426.

> The record here clearly discloses Mrs. Patterson had access to the kitchen-dining room area. . . . Until . . . [she was handcuffed] that area continued within the area of her "immediate control".
>
> * * * * * *
>
> The detective's entry into the kitchen was reasonable in assuring the safety of the arresting officers. This area was within the immediate control of appellant's wife. Therefore, it was a reasonable search incident to a lawful arrest. The evidence obtained would be admissible since "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968).

447 F.2d at 427.

warrant, but upon probable cause, was held to be reasonable and the money orders to be admissible into evidence. *Chimel* was cited as authority, and without referring to it as such, plain view reasoning was also relied upon.[8] Both of these decisions, among others, support the validity of the search and seizure of the "Your Pharmacy" file.

## II. THE PLAIN VIEW DOCTRINE

### A.

Even assuming that the "Your Pharmacy" file was outside defendant's "immediate control" or "reach," so that its seizure would exceed the *Chimel* parameters, the particular search in question must still be deemed to be a "plain view" search and clearly reasonable under the Fifth Amendment. *See, e. g., Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The *Chimel* doctrine has in no way restricted the permissibility or scope of plain view searches, *Dorman v. United States,* 140 U.S. App.D.C. 313, 322, 435 F.2d 385, 394 (1970) *(en banc); United States v. Thweatt, supra,* 140 U.S.App.D.C. at 123, 433 F.2d at 1229. Such searches are within the "well recognized exceptions" that *Chimel* refers to. The "Your Pharmacy" file must be held to

have been within the "plain view" of the agent whose right to be where he was has not been questioned here.

About sixty of Scios' business files were out in open view on the top of the credenza, as shown by Defendant's Exhibit 3L, in three wires racks each containing about 20 files. From an examination of Exhibit I it can be seen that the typewritten "Your Pharmacy Service" on the protruding index tab of Scios' file is sufficiently large so that it can be read from a distance of six feet by a person with normal eyesight (Officer Swayze was, in fact, within 18 inches of the file when he was "guarding Scios.") The files on top of the credenza were arranged three groups each containing about twenty file folders (Tr. III, 52 *and see* Defendant's Exhibit 3L reproduced *supra* ). All were in an upright position, and the file in question was about 10 or 15 files from the front (Tr. III, 21). It appears from very close examination of Defendant's Exhibits 3L and 3M and Government Exhibit I, that the files' tabs were *staggered* (Tr. III, 50) with the result (and no doubt the express purpose) that one tab would not obstruct the view of the tabs on the back files. The agent testified that he "looked down the line" of the name tabs and discovered the file (Tr. III, 19). The files were not in any way concealed or placed in a closed area, and they were open at the top. They were not in

---

**8.** *United States v. Wysocki,* 457 F.2d 1155 (5th Cir.), *cert. denied,* 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972). Wysocki's arrest took place on probable cause without a warrant in a motel room 10 to 12 feet wide and 14 to 16 feet in depth. Wysocki was found in the middle of the room and the agents searched that immediate area. A closet door was open and Wysocki asked the agent to get some clothes. In doing so the agent observed a box which he thought "was a gun box" but it was six feet from Wysocki. Nevertheless he opened it and discovered a batch of stolen money orders. The search was held to be reasonable and the seizure of the box not to be contrary to *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Squella-Avendano,* 447 F.2d 575 (5th Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *United States v. Brookins,* 434 F.2d 41 (5th Cir. 1970),

*cert. denied,* 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971); *Klingler v. United States,* 409 F.2d 299 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969). The trial court was sustained in its refusal to suppress the money orders as the fruits of an unlawful search. The court noted that the officer was "where he had a right to be . . .." 457 F.2d at 1160. The plain view doctrine was not expressly relied upon as such, but the reasoning is in that vein. What the court in effect held was that it was within *Chimel,* et al., to search (open the box) that was observed in plain view some six feet from where the arrestee was seated in the middle of the room. While *Scios* is a stronger case on the facts than *Wysocki* —because when Scios was walking around the room he was much closer than six feet to the files—the essential facts in *Wysocki* are practically the same as those involved with one aspect of *Scios.*

drawers. They were filed upright, each separated merely by a single piece of wire in the manner of phonograph record racks. All the files were visible, with the protruding topical, staggered tabs at belt-height, easy-to-read level (*see* Defendant's Exhibit 3L).

In those instances where from the initial view it is immediately apparent that the article constitutes relevant evidence in the case the courts hold that "no search" was indulged in and that the item is admissible. *United States v. Coplen,* 541 F.2d 211, 214 (9th Cir. 1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (1977); *United States v. Wilson,* 524 F.2d 595, 598 (8th Cir. 1975), *cert. denied,* 424 U.S. 945, 96 S.Ct. 1415, 47 L.Ed.2d 351 (1976); *Blassingame v. Estelle,* 508 F.2d 668, 669 (5th Cir. 1975); *United States v. Conner,* 478 F.2d 1320, 1323 (7th Cir. 1973); *Grimes v. United States,* 405 F.2d 477, 478 (5th Cir. 1968); *United States v. Wright,* 146 U.S.App.D.C. 126, 130, 449 F.2d 1355, 1359 (1971), *cert. denied,* 405 U.S. 947, 92 S.Ct. 986, 30 L.Ed.2d 817 (1972); *United States v. Cisneros,* 448 F.2d 298, 303 (9th Cir. 1971); *Grimes v. United States,* 405 F.2d 477, 478 (5th Cir. 1968); *Coates v. United States,* 134 U.S.App.D.C. 97, 99, 413 F.2d 371, 373 (1969); *Creighton v. United States,* 132 U.S. App.D.C. 115, 116, 406 F.2d 651, 652 (1968); *Hiet v. United States,* 125 U.S.App.D.C. 338, 339, 372 F.2d 911, 912 (1967); *cf. Coolidge v. New Hampshire, supra.* In other cases where the initial observance of the article or articles in plain view is sufficient to find probable cause to conclude that they constitute evidence, but their precise evidentiary value is *not* immediately apparent and further inspection is necessary, we have also held that a limited search or examination is permissible. If the closer examination is conducted in a reasonable manner and leads to the discovery of relevant evidence the "search" is valid under the Fourth Amendment. *United States v. Mason, supra; United States v. Wysocki, supra; United States v. Patterson, supra; Dorman v. United States,* 140 U.S.App.D.C. 313, 323, 435 F.2d 385, 395 (1970) (*en banc*); *United States v. Thweatt, supra; Ellison v.*

*United States,* 93 U.S.App.D.C. 1, 3, 206 F.2d 476, 478 (1953) (small musical instrument box found to contain narcotics). These decisions apply a combination of *Chimel* and the plain view doctrine.

### B.

What is required then is proof (1) that the agents had a right to be in the location where they were when they observed the article; (2) that the sighting of the object was inadvertent; and (3) that it was immediately apparent that probable cause existed to believe that the article constituted relevant evidence. I find that all three requirements were satisfied.

There is no doubt that (1) is clearly satisfied. The agents had a right to be where they were to execute the warrant for arrest. Even using a flashlight to peer into obscure parts of an area does not defeat a "plain view" argument, *e. g., United States v. Johnson,* 506 F.2d 674 (8th Cir. 1974), *cert. denied,* 421 U.S. 917, 95 S.Ct. 1579, 43 L.Ed.2d 784 (1975); *United States v. Wickizer,* 465 F.2d 1154, 1157 (8th Cir. 1972) (concurring opinion of Judge Bright); *Marshall v. United States,* 422 F.2d 185 (5th Cir. 1970). There is thus no reason here to hold the search to be unconstitutional where, at the most, all that was done was to riffle the raised tabs of several files in plain view until the file marked "Your Pharmacy Service" was noted.

As for (2), the trial court seems to have been misled in failing to apply the "plain view" doctrine by a belief that the discovery of the files was not "inadvertent" and thus could not pass constitutional muster under the rubric of a "plain view" search. It is unquestioned when law enforcement personnel know in advance that certain evidence exists in a particular location and they enter intending to seize it, but neglect to get a warrant and thereafter seek to rely on the plain view doctrine, that such search is unconstitutional. *E. g., Coolidge v. New Hampshire, supra,* 403 U.S. at 470, 91 S.Ct. 2022; *United States v. Griffith,* 537 F.2d 900 (7th Cir. 1976). In such

circumstances the validity of the search is defeated because the discovery is not inadvertent. However, the mere *expectation* of the presence of some evidence—even assuming arguendo such an expectation was present here—does not preclude application of the "plain view" doctrine, *e. g., Coolidge v. New Hampshire, supra,* 403 U.S. at 472, 91 S.Ct. 2022; *Ker v. California,* 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. Cushnie,* 488 F.2d 81, 82 (5th Cir. 1973), *cert. denied,* 419 U.S. 968, 95 S.Ct. 233, 42 L.Ed.2d 184 (1974). Practically every arresting officer might expect to seize some evidence incident to any arrest for a crime for which physical evidence might inculpate an accused.

The record here does not raise any serious doubt that when the arresting agents went to Scios' home to arrest him, they did *not* intend to search warrantlessly for the file, *see United States v. Sedillo,* 496 F.2d 151, 152 (9th Cir.), *cert. denied,* 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974). They had no advance knowledge of the files and did not know that they would be admitted to Scios' office. The agents presented themselves at Scios' door prepared to arrest him when they were sure of his identity, and then it was Scios himself who led the police into his office so his female companion would not overhear their conversation (Tr. III, 45–46). Therefore, it cannot be concluded that the agents had planned to use the arrest as a pretext for searching his office, *see United States v. Mason, supra,* 173 U.S.App.D.C. at 177, 523 F.2d at 1126, or to acquire any items of evidence. The agents did not even know that the office existed, much less that Scios had a "Your Pharmacy" file with his other business files out in the open in his office. The agents did not know in advance whether any bugging equipment or files might be present. They actually did discover "some electronic equipment . . . some wires. Some little black boxes . . ." in an attache case but they did *not* seize any of such material. No general search was conducted, but it is important to note that they turned up a loaded revolver, some shoulder arms and a sawed-off shotgun—none of

which were seized. On the basis of this record, it thus appears that the *discovery* of the "business files" was clearly inadvertent.

It may also be stated that the discovery here was "inadvertent" within the Supreme Court standards because, to paraphrase the *Coolidge* standards, "the discovery [of the *files* was not] anticipated . . . the police [did not] know in advance they [would] find [the files] in plain view and intend to seize [them]." *Cf. Coolidge v. New Hampshire, supra,* 403 U.S. at 470, 91 S.Ct. at 2040.

C.

The majority, however, asserts that the file is not to be considered as being seized in a "plain view" search, *i. e.,* that "[t]he folder was not in plain view."

Such assertion involves an application of the third criteria, *i. e.,* was the evidentiary relevance of the file immediately apparent when it was discovered. If the agent's testimony is accepted that he "looked down the line" of file name tabs and discovered the file with the "Your Pharmacy Service" typed title on the upward protruding index tab, under the "plain view" cases cited and ante, p. —— of 191 U.S.App.D.C., p. 974 of 590 F.2d, we have "no search" and hence no taint of the evidence resulted therefrom. Even if we reject the agent's testimony, as the court apparently did in part, there is still no doubt that, following the discovery of 60 Scios *business* files in plain view, there was probable cause to believe that a file covering the work he did for the "Pharmacy" would be included among his other business files. The resulting closer look was therefore reasonable, and the mere discovery of the "Your Pharmacy Service" index tab was sufficient to make it "immediately apparent" to anyone that the file constituted relevant evidence of the offense for which Scios was being arrested.

It is significant that the agent did not examine the contents of the file (Tr. III, 30–31). It was seized solely because of its title, and I would hold that, from the title

alone, it is reasonable to conclude that its evidentiary relevance was immediately apparent. At the least it was convincing proof that Scios, a wire tapper and bugger, had worked at "Your Pharmacy" where the wire tap was found. The assertion by the majority, thus fails to recognize the facts and the law. The "Pharmacy" file was one of the folders in plain view. *See* Defendant's Exhibit 3L. To say that the single *folder* was not in plain view runs counter to *Patterson, Wysocki* and *Mason, supra.*

### D.

The situation here may be likened to that of an officer who observes a substantial number of opaque glassine bags, of the kind that are usually used to contain narcotics, on a distant desk while he is making a valid arrest under a warrant charging a narcotics offense. Suppose also, as here, that the arrestee had himself led the officers to the room where the bags were in plain view. Under such circumstances, it would clearly have been permissible to open the bags to see if they contained narcotics even though at the moment they were beyond the reach of the suspect and it was not immediately apparent that they contained narcotics.

Similarly, if an arrest warrant was issued against a suspect for robbing a bank of $25,000 in currency, and the agents in executing it observed packets of Treasury bills on the top of the credenza, just beyond the reach of the suspect, it would be permissible to seize the bills and examine (search) them to determine if the serial numbers conformed to those on the stolen currency.

*Business files* in open view to an agent standing where he has a right to be in an arrest on a charge involving the suspect's *business* may be the subject of a search and seizure just as much as opaque glassine bags and currency in plain view in arrests on warrants charging narcotics or bank robbery offenses. One may reasonably conclude, given the nature of the crime alleged, that such files contain potentially incriminating evidence, and when they are first observed in plain view, it is reasonable and permissible to make a further close inspec-

tion without any violation of the Fourth Amendment.

Scios was being arrested for an offense related to his *business* and, from a mere glance at all the files in plain view, it was obvious from their number, size, character, labelling and location that they were Scios' *business* files. *See* Defendant's Exhibits 3L and 3M. Just recently, in *United States v. Mason, supra,* a search of a *partially opened* suitcase was deemed permissible under the "plain view" doctrine, and there is no principled distinction between examination of a partially open suitcase and files with index tabs that were partially disclosed.

In this case, and others similar to it referred to ante, it should be noted that the plain view doctrine does *not* require the officer or agent to determine positively from his first plain view of the article or articles *from a distance* that the particular article subsequently seized is relevant admissible evidentiary material to a criminal offense. What is required is that the article singly or with other articles or containers (boxes, suitcases, brief cases, etc.) be in plain view and that from what is so observed the agent or officer be justified, from his prior experience or otherwise, in having probable cause to believe that the article or articles constitute a threat to the arresting officers, or *possible evidence* related to law violations—preferably to the offense for which the party is being arrested. It is not necessary to the validity of a plain view search that the agent, when he first viewed the business files, determined without closer inspection that one of the files was the "Pharmacy" file. It is sufficient if the "Pharmacy" file was one of the files in plain view of the agent and there is no necessity that he identified the file before he began riffling the tabs.

Thus, the plain view doctrine as applied in *Dorman, Thweatt, Patterson, Wysocki, Ellison* and *Mason* permits the agent to "search," *i. e.,* examine closer, the suspicious article or articles in plain view to determine if his suspicion is justified. The majority in n. 15 seems to be operating under the misapprehension that it was impermissible to

"thumb through" the file tabs, to "leaf through them." However, that is what an authorized search consists of, and since the offense was business related once the *business files* were inadvertently discovered out in the open where all could see them on the top of the credenza when Scios led the agents into his office, it was permissible under the plain view doctrine to examine the business files more closely and to discover the particular file which bore the "Your Pharmacy" tab. Actually it would have been reasonable to seize all Scios' business files which were in plain view and search them for the "Your Pharmacy" file because there was probable cause to believe that such file would be included.

Both the trial judge and the majority make the error of contending that the inadvertence required by the plain view doctrine must be restricted to the point of requiring that the officer conclusively discover when the files were first observed that the particular item of evidence in question was absolutely material, relevant and admissible in the case. But, as explained above, inadvertence to that extent is not required. The discovery of the group of *business files* was completely inadvertent and that is all the inadvertent discovery that is required since the discovery of their existence constituted probable cause to believe that the "Pharmacy" file was among them.

In application of this principle courts have held it to be permissible to examine a *closed* box that the agent reasonably suspected of holding a gun and to introduce the stolen money orders that were discovered even though no gun was found. *United States v. Wysocki, supra.* Also, while looking for a gun it is constitutional to seize a "*partially hidden* folder or envelope" from a

shelf in a cabinet which subsequent examination disclosed contained a "check . . checkbook . . . and a safety deposit box key . . . ." that were admitted in the trial of the offense (forgery) for which the arrest was made. *United States v. Patterson, supra.* Following the same logic, in *United States v. Mason, supra,* we allowed the seizure of unidentified car keys discovered in plain view on a table in the apartment where the arrest was made, even though it was not discernible from the initial "plain view" that the keys were for any car that was involved in the criminal offense being investigated. In *Dorman v. United States, supra (en banc),* we upheld a warrantless search made pursuant to an entry on probable cause to arrest. The search resulted in the discovery in a closet in plain view after the door was opened, of a suit resembling one stolen in the crime being investigated, but while the suit was "readily identifiable," a closer inspection was obviously necessary to determine that it bore the "label of Carl's Men's Shop." The seizure under such circumstances was held to be reasonable.

Allowing narcotics officers to seize white powder in glassine bags in plain view at the time of a narcotics arrest is also everyday routine, and admittedly constitutional, notwithstanding that a subsequent test is necessary to determine whether or not the contents contain a controlled substance.[9]

Finally, we are admonished by *Chimel* that "the reasonableness of searches . . [depend upon] the total atmosphere of the case"—which was quoted from *United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950). When this standard is applied it is my conclusion that the search and seizure of the file in

---

**9.** The plain view doctrine is partially misapplied by Judge Tone's opinion in *United. States v. Griffith,* 537 F.2d 900, 903 (7th Cir. 1976) to the extent that it decides the search was not inadvertent because the "officer's *inspection* was not inadvertent." Under *Coolidge v. New Hampshire,* it is the "*discovery,*" 403 U.S. at 470, 91 S.Ct. 2022, of the suspicious article that determines "inadvertence," not the subsequent closer *inspection* or examination of that article.

*Griffith,* however, is saved from being controlled by error because the *discovery* was not inadvertent since the officers had been in the room earlier and had seen the various articles. Their subsequent return to the room thus puts the case into the category of a *planned* warrantless search for the articles they had previously observed—clearly an advertent search—a far cry from this case.

question was reasonable and thus lawful under the guidelines established by *Chimel* since it was (1) within Scios' reach and (2) within Scios' immediate control within the small room. In addition, as a complete basis for reversing the trial court, I find that the file and its contents were properly seized under the "plain view" doctrine as set forth in *Coolidge v. New Hampshire,* 403 U.S. at 464–473, 91 S.Ct. 2022. Such doctrine is one of the exceptions recognized by *Chimel,* 395 U.S. at 762–63, 89 S.Ct. 2034.

It thus appears that the majority are adopting an overrigid interpretation of *Chimel* insofar as it relates to the permissible scope of warrantless searches incident to arrests. Such ruling will unnecessarily handicap reasonable efforts to bring law violators to justice. I have particular difficulty with n. 15 in the majority opinion which in the fifth paragraph relies upon *Chimel,* and in the sixth paragraph declares that "*Chimel* is inapplicable." In my view, as outlined above, the majority opinion misapplies the law in controlling particulars, especially (1) as to the search that was permissible because of Scios' proximity to the files on three separate occasions at about the same time that the agent was looking at the files, and (2) as to the plain view exception. *See* Maj. op. n. 15 specifically. The recent opinion of Mr. Justice Stewart in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), does not compel a different result in any respect. In fact, *Mincey* reaffirmed the continued viability of *Chimel* and the "plain view" doctrine, at 393, 98 S.Ct. 2408, when it refused to validate the greatly delayed general search of the entire house which was not finished until four days after the murder.

I thus respectfully dissent from the majority opinion, join the opinion of Judge Robb, and join the result reached by Judge Wilkey's opinion, but for a different reason. Judge Robb joins in this opinion.

ROBB, Circuit Judge, dissenting:

I concur in the views expressed by Judge MacKinnon and add a few words.

When this case was before the panel of which I was a member, in 1976, I thought the "fruit of the poisonous tree" doctrine did not require the suppression of Massa's testimony. I reasoned that the basis of this exclusionary rule is that it deters police misconduct, and that the nature of the police conduct in each case is the decisive factor in judging whether unlawful searches and seizures will be deterred. It seemed to me that exclusion of Massa's testimony could have no deterrent effect because the FBI agents who seized the Scios folder had acted in good faith and their conduct was at most marginally unlawful.

My theory became untenable in 1978 when the Supreme Court decided *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). In that case the Court listed the factors which made the witness Hennessey's testimony admissible:

The evidence indicates overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips. Nor were the slips themselves used in questioning Hennessey. Substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other. While the particular knowledge to which Hennessey testified at trial can be logically traced back to Biro's discovery of the policy slips, both the identity of Hennessey and her relationship with the respondent was well known to those investigating the case. There is in addition, not the slightest evidence to suggest that Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and search with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have

the slightest deterrent effect on the behavior of an officer such as Biro. The cost of permanently silencing Hennessey is too great for an even-handed system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.

*Id.* at 1062.

In the case before us (1) we cannot say that Massa's testimony was the act of his own free will, in no way coerced or even induced by official authority. He was threatened with jail if he remained silent; (2) the papers obtained in the search at the Scios office were used by the agent who questioned Massa; (3) the identity of Massa as a witness and his relationship with Scios were not known to the investigators until the leads obtained by the search were exploited; (4) it cannot be said that when Scios invited the agents into his office they entered with no intention of finding tangible evidence. In short, the evidence in our case negatives most of the factors upon which the Supreme Court relied in its *Ceccolini* decision. The Supreme Court did say "no mathematical weight can be assigned to any of the factors which we have discussed." *Id.* I cannot believe however that the only two affirmative factors found in this case—the lapse of time and the nature of the police conduct—can outweigh all the negative factors which are present.

Reflection has led me to reexamine the premises upon which the District Court's conclusions were based. These premises were (1) the warrant for the arrest of Scios was invalid because unsupported by probable cause and (2) assuming that the warrant was valid, seizure of the file folder was unlawful.

In my opinion the affidavit supporting the warrant does establish probable cause to believe that Scios was responsible for the taps on the telephone lines of "Your Pharmacy, Inc." On its face the affidavit sets out the following facts: The attorney for the drugstore, Forrester, asked Scios to investigate the financial losses being suffered by the store. Scios replied that he "didn't do this kind of thing, but was primarily a 'wiretapper, bugger and camera surveillance man.' ". Forrester said he could not employ Scios but he referred him to the owner of the store, Judge Norton. Subsequently Norton hired Scios and paid him "by a check drawn to another name". Thereafter the taps on the lines of "Your Pharmacy, Inc." were found by telephone linemen. In the course of the resulting investigation a telephone conversation took place between Scios and an FBI agent posing as a father concerned about his daughter's association with an undesirable man. Although guarded in his remarks Scios plainly indicated that he was prepared to investigate the matter by means of wiretaps, and he at least intimated that he had done similar work for "Your Pharmacy, Inc." In my judgment these facts are enough to support a reasonable belief that Scios was the man who placed the taps at "Your Pharmacy, Inc."

As for the seizure of the file folder, I agree with Judge MacKinnon that it was valid within the principle of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The wire rack holding the folder was in plain view within six feet of Scios when he was arrested, and I think a search incident to the arrest could include an examination of the contents of the file folder. There was no rummaging through desk drawers or closets, but a mere riffling of the protruding index tabs of the files in the open rack. *See United States v. Patterson,* 447 F.2d 424 (10th Cir. 1971); *United States v. Sheard,* 154 U.S.App.D.C. 9, 14, 473 F.2d 139, 144 (1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973). The momentary presence of an agent between Scios and the file, at the time it was seized, did not mean that it had not been within his immediate control before the seizure. The file was on top of a credenza, directly to the right of where Scios was sitting at his desk, and not more than six feet away; and obviously the agent could not examine it without coming between Scios and the credenza. The search for evidence was not invalidated merely because the act of making it placed the evidence beyond the prisoner's reach.

I would reverse the order of the District Court.

WILKEY, Circuit Judge, with whom TAMM, Circuit Judge, joins, dissenting:

The question in this case is whether the Fourth Amendment exclusionary rule renders inadmissible, as fruit of the poisonous tree, the testimony of a live witness whose identity was learned as the result of an illegal search. The majority holds, first, that the exclusionary rule generally applies to cases of live-witness testimony and, second, that the exclusionary rule applies on the facts of this case because the taint affecting the testimony of Thomas Massa, Jr., has not been attenuated, either by that witness' acts of volition or by other intervening events. I disagree with both conclusions.[1]

If traditional "attenuation" analysis is applied here, it demonstrates, I believe, that any taint attaching to the testimony of Thomas Massa, Jr., has been dissipated. More fundamentally, however, I believe that traditional "attenuation" analysis is inapposite in cases of this sort. The question whether live-witness testimony should be suppressed ought to be answered, not by a case-by-case "attenuation" inquiry, but by direct resort to exclusionary rule policies, employing the analysis the Supreme Court has employed in other recent cases involving extensions of the exclusionary rule, such as *United States v. Calandra*,[2] *United States v. Janis*,[3] and *Stone v. Powell*.[4] In those cases the Court adopted a balancing approach under which application of the exclusionary rule in a given class of cases was determined by whether the deterrence benefits of excluding probative evidence justified the social costs of inhibiting the search for truth.

If this balancing approach is applied here, it yields, I believe, a general rule that the exclusionary rule does not operate to exclude the testimony of a live witness whose identity was learned as the result of an illegal search. I conclude, therefore, that Thomas Massa, Jr., should testify, and respectfully dissent.

## I. FACTS

It may be useful to begin by detailing somewhat the background to this case, since the majority's position on the merits has permitted a rather terse and therefore selective recapitulation of the facts. On 15 February 1974 Robert Scios was arrested in New York. In a search incident to that arrest, a file folder was improperly seized by the FBI. Included in the file was a receipt from a motel in Washington, D. C.; attached to this receipt was a piece of paper bearing the name "Mr. Massa." An FBI agent interviewed the desk manager and the bookkeeper of the motel; neither remembered the occupant of the room. Inquiry revealed, however, that there was still available a record of telephone calls made from the room. There were two numbers,

---

1. The bulk of this opinion was written prior to *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), in which the Supreme Court for the first time considered whether the exclusionary rule requires suppression of the testimony of a witness whose identity or whose possession of relevant information was learned as the result of an illegal search. The *Ceccolini* majority, while holding that sufficient attenuation had occurred on the facts of that case to make the testimony in question admissible, declined to embrace the principle, advocated by the Justice Department, adopted by the Chief Justice, and recommended here, that the exclusionary rule *in general* should not apply to live-witness testimony. The multi-factor attenuation analysis employed by the *Ceccolini* majority is applied to the facts of this case in Part VI *infra*.

2. 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (exclusionary rule does not operate in grand jury proceeding to bar questions based on evidence obtained from unlawful search and seizure).

3. 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (exclusionary rule does not operate in federal civil proceeding to bar evidence unlawfully seized by state criminal authorities).

4. 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (state prisoner cannot raise exclusionary rule claim on federal habeas corpus when he has been afforded opportunity for full and fair litigation of claim in state courts).

one each in New Jersey and New York. Subscribers to these numbers were identified, the one in New York being Thomas Massa. A grand jury subpoena for Thomas Massa was issued. The U. S. Marshal serving the subpoena discovered that there were two Thomas Massas, Senior and Junior, father and son. Contact was made with Thomas Massa, Sr., and other members of the family, but Thomas Massa, Jr. was out of town, unlocatable and unavailable for several days.

When Thomas Massa, Jr., returned to New York, his family told him of the Government's inquiries and persuaded him that he should speak to the prosecutor. Massa consulted a lawyer in New York, who advised him to say nothing until he was granted immunity. The prosecutor in charge of the investigation refused to offer Massa immunity by letter. On 5 May 1974, therefore, Massa went to Washington and spoke with an Assistant U. S. Attorney. Massa said that he would assert his privilege against self-incrimination before the grand jury. The prosecutor told Massa that a grant of immunity was imminent and asked him for an off-the-record proffer. Massa replied by giving an outline of what his testimony would be. During this meeting Massa was shown some of the Government's evidence, including material seized from the file folder. Later that same day, Massa claimed his Fifth Amendment privilege before the grand jury. On 8 May Massa returned to court, having retained counsel in Washington. The district court signed immunity papers, and Massa testified before the grand jury under grant of immunity.

5. 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

6. *See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

7. 251 U.S. at 392, 40 S.Ct. at 183.

8. 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

9. *Id.* at 341, 60 S.Ct. at 268.

## II. TRADITIONAL ATTENUATION ANALYSIS IN LIVE–WITNESS CASES

In *Silverthorne Lumber Co. v. United States,*[5] the Supreme Court held that the exclusionary rule renders inadmissible in a criminal trial not only evidence illegally seized, but evidence collaterally or tangentially derived from an unlawful search or arrest—the "fruit of the poisonous tree."[6] Application of the exclusionary rule to the fruits of lawless activity, of course, has never been absolute. In *Silverthorne* the Court recognized that facts improperly obtained may be proved at trial "[i]f knowledge of them is gained from an independent source."[7] In *Nardone v. United States,*[8] the Court suggested that arguably tainted evidence may be admitted at trial if the causal connection between that evidence and the Government's illicit acts has "become so attenuated as to dissipate the taint."[9] It is this "attenuation" doctrine that concerns us here.[10]

The Supreme Court elaborated the attenuation doctrine in *Wong Sun v. United States,*[11] a case that required the Court to consider whether physical evidence and verbal admissions were fruit of the poisonous tree. In considering whether physical evidence (narcotics) was admissible, the *Wong Sun* Court said that the proper test was " 'whether . . . the evidence to which instant objection is made has been *come at by exploitation of [the primary] illegality* or instead by means sufficiently distinguishable to be purged of the primary taint.' "[12] In considering whether verbal admissions were admissible, the Court said that the proper test was whether the statements were "*sufficiently an act of free will* to

10. In neither this Court nor the district court did the Government contend that there was an independent source for Massa's testimony. *See* Brief of the United States at 12.

11. 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

12. *Id.* at 488, 83 S.Ct. at 417, *quoting* Maguire, Evidence of Guilt 221 (1959) (emphasis added).

purge the primary taint."[13] In applying the attenuation doctrine to physical evidence and confessions, in other words, the Court seemed to focus, respectively, *on directness of causation and on voluntariness.*

The Court descanted on the voluntariness requisite to attenuation in *Brown v. Illinois,*[14] which like *Wong Sun* involved a confession following an illegal arrest. The Court said that "[t]he question whether a confession is the product of a free will under *Wong Sun* must be answered on all the facts of each case,"[15] and listed as factors of special relevance the elapsed time between the confession and the arrest, the presence of intervening circumstances, and the flagrancy of the police misconduct.[16]

These cases did not require the Court to consider whether the exclusionary rule renders inadmissible as fruit of the poisonous tree *the testimony of a live witness* whose identity was learned as the result of an illegal search.[17] The lower courts generally have held such testimony inadmissible, subject to the attenuation doctrine of *Wong Sun.*[18] In gauging attenuation, they have usually employed the same tests used by the Supreme Court to gauge attenuation in the case of physical evidence and confessions. Drawing upon *Wong Sun,* for example, a number of courts have concluded that the "crucial test" is whether the witness' testimony constitutes an "exploitation" of the original illegality.[19] In answering this question, most courts have hazarded *a priori* assessments of the "directness" of the causal chain linking the testimony to the primal wrong.[20] The courts have considered both

13. *Id.* at 486, 83 S.Ct. at 416 (footnote omitted, emphasis added). Defendant Toy had made incriminating statements in his bedroom following a 6 a.m. police raid. "Under such circumstances," said the Court, "it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* Defendant Wong Sun had made incriminating statements at the police station after he "had been released on his own recognizance . . . and had returned voluntarily several days later" to confess. On this evidence, the Court had that "the connection between the [illegal] arrest and the statement had 'become so attenuated as to dissipate the taint.'" *Id.* at 491, 83 S.Ct. at 419, *quoting Nardone,* 308 U.S. at 341, 60 S.Ct. 266.

14. 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

15. *Id.* at 603, 95 S.Ct. at 2261.

16. *Id.* at 603–04, 95 S.Ct. 2254. Fifth Amendment voluntariness, said the Court, is merely a "threshold requirement." *Id.* at 604, 95 S.Ct. 2254.

17. The Court did not consider this question until *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). *See United States v. Brignoni-Ponce,* 422 U.S. 873, 876 n.2, 95 S.Ct. 2574, 2577, 45 L.Ed.2d 607 (1975) ("There may be room to question whether voluntary testimony of a witness at trial . . . is subject to suppression as the fruit of an illegal search or seizure. . . . But since the question was not raised in the petition for certiorari, we do not address it."); *Harrison v. United States,* 392 U.S. 219, 223 n.9, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968) ("We have no occasion in this case to canvass the complex

and varied problems that arise when the trial testimony of a witness other than the accused is challenged as 'the evidentiary product of the poisoned tree'") (quoting Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness,* 15 U.C.L.A.L.Rev. 32, 44 (1967)).

18. *E. g., United States v. Ceccolini,* 542 F.2d 136, 142 (2d Cir. 1976), *rev'd,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Guana-Sanchez,* 484 F.2d 590, 592 (7th Cir. 1973), *cert. dismissed as improvidently granted,* 420 U.S. 513, 95 S.Ct. 1344, 43 L.Ed.2d 361 (1975); *United States v. Marder,* 474 F.2d 1192, 1195 (5th Cir. 1973) ("This circuit has followed the general rule that if the identity of a government witness and his relationship to the defendant are revealed because of an illegal search and seizure, the testimony of such witness must be excluded") (citing cases); *Smith and Anderson v. United States,* 120 U.S.App.D.C. 160, 162, 344 F.2d 545, 547 (1965).

19. *United States v. Beasley,* 485 F.2d 60, 64 (10th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 292 (1974). *See United States v. Hoffman,* 385 F.2d 501, 504 (7th Cir. 1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968); *Smith and Anderson v. United States,* 120 U.S.App.D.C. 160, 162, 344 F.2d 545, 547 (1965); *Edwards v. United States,* 117 U.S.App.D.C. 383, 385, 330 F.2d 849, 851 (1964).

20. *E. g., United States v. Karanthos,* 531 F.2d 26, 35 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976) ("close connection" between illegal search and live-witness testimony). *Compare, Parker v. Estelle,*

the amount of time that has elapsed [21] and the number of events that have intervened,[22] and have been wont to express their analysis in a geographical metaphor: exclusion is required if the road from the illegality to the witness, however long, is not "winding," but is "uninterrupted" and "straight." [23]

Equally prominent in the courts' analyses has been the inquiry, likewise drawn from *Wong Sun,* whether the testimony of the live witness is "sufficiently an act of free will to purge the primary taint." [24] In conducting this inquiry, this Court has said that it is necessary to determine in each case "how great a part the particular manifestation of 'individual human personality' played in the ultimate receipt of the testimony in question." [25] Indications that a witness' testimony is sufficiently voluntary include evidence that the witness changed his mind about testifying,[26] that the witness would have come forward voluntarily regardless of his identification by the illegal search,[27] that uncertainty existed as to the content of the witness' testimony,[28] and that the testimony was not given in response to pressure from the prosecutor or the police.[29] In all these cases, the courts

498 F.2d 625, 630 (5th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975) (live-witness testimony admissible unless tied "clearly and directly" to illegal search) *with Williams v. United States,* 382 F.2d 48, 51 (5th Cir. 1967) (live-witness testimony inadmissible if "indirect product" of illegal search) *and United States v. Tane,* 329 F.2d 848, 853 (2d Cir. 1964) (live-witness testimony inadmissible if illegal information led "directly or indirectly" to discovery of witness).

**21.** *E. g., United States v. Beasley,* 485 F.2d 60, 64 (10th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 292 (1974) (lapse of three days between illegal event and witness' decision to testify causes attenuation); *Brown v. United States,* 126 U.S.App.D.C. 134, 138, 375 F.2d 310, 314, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967) (lapse of 13 months between illegal event and witness' testimony causes attenuation).

**22.** *E. g., United States v. Evans,* 454 F.2d 813, 818 (8th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2423, 32 L.Ed.2d 668 (1972); *Brown v. United States,* 126 U.S.App.D.C. 134, 138, 375 F.2d 310, 314, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).

**23.** *E. g., United States v. Ceccolini,* 542 F.2d 136, 142 (2d Cir. 1976), *rev'd,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (road from unconstitutional search to witness' testimony "is both straight and uninterrupted"); *Williams v. United States,* 382 F.2d 48, 51 (5th Cir. 1967) ("road from the illegal search to the testimony . . . although a little long, was not a winding one"); *Smith and Anderson v. United States,* 120 U.S.App.D.C. 160, 162, 344 F.2d 545, 547 (D.C.Cir. 1965), *quoting United States v. Tane,* 329 F.2d 848, 853 (2d Cir. 1964) ("The road from the [illegal source] to the testimony may be long, but it is straight").

**24.** *E. g., United States v. Karanthos,* 531 F.2d 26, 35 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976) (testimony inadmissible where witnesses were subject to Government "leverage"); *United States v. Crouch,* 528 F.2d 625, 629–30 (7th Cir.), *cert. denied,* 429 U.S. 900, 97 S.Ct. 266, 50 L.Ed.2d 184 (1976) (testimony admissible where witness "made a voluntary choice to divulge . . . information"); *United States v. Beasley,* 485 F.2d 60, 64 (10th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 292 (1974) (testimony admissible where there was "high degree of probability that [witness] exercised her own volition"); *United States v. Hoffman,* 385 F.2d 501, 504 (7th Cir. 1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968) (testimony admissible where witness made "voluntary decision to plead guilty" and testify for prosecution); *United States v. Tane,* 329 F.2d 848, 853 (2d Cir. 1964) (testimony inadmissible where witness was unwilling to testify until informed that police had information gained from illegal wiretap).

**25.** *McLindon v. United States,* 117 U.S.App. D.C. 283, 286, 329 F.2d 238, 241 n.2 (1964).

**26.** *See United States v. Marder,* 474 F.2d 1192, 1196 (5th Cir. 1973); *Edwards v. United States,* 117 U.S.App.D.C. 383, 385, 386, 330 F.2d 849, 851–52 (1964); *McLindon v. United States,* 117 U.S.App.D.C. 283, 286, 329 F.2d 238, 241 n.2 (1964).

**27.** *See United States v. Marder,* 474 F.2d 1192, 1196 (5th Cir. 1973); *McLindon v. United States,* 117 U.S.App.D.C. 283, 286, 329 F.2d 238, 241 n.2 (1964).

**28.** *Id.*

**29.** *Compare United States v. Karanthos,* 531 F.2d 26, 35 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976) (testimony inadmissible where witnesses agreed to testify after promise of non-prosecution) *and Unit-*

have agreed that attenuation of a taint affecting live-witness testimony must be determined on an *ad hoc* basis, after consideration of all the facts of each case.[30]

If this traditional multi-factor analysis is applied to the facts of this case, it reveals, I believe that any taint attaching to the testimony of Thomas Massa, Jr., has been attenuated. This result follows whether one focuses on the indirectness of the link between that testimony and the primal illegality,[31] or on the volitional factors that operated to determine what Massa's testimony would be.[32]

Having pondered our experience as revealed in these precedents, however, I have concluded that the traditional analysis should be employed no longer. This fact-oriented, case-by-case approach, which is perpetuated by the majority today, has pro-

duced an incoherent and intractable body of law. Whatever the utility of the multi-factor analysis in gauging attenuation of the taint in cases of physical evidence or confessions, that analysis is based on principles which, in the case of live-witness testimony, are of dubious logical relevance. The traditional analysis is bereft of intellectual rigor, for it consists for the most part of bandying conclusory terms that do no more than express the result a court desires to reach. The traditional analysis, not surprisingly, has led to a plethora of inconsistent decisions, not only among the circuits, but within in the same circuit.[33] I believe that the traditional analysis should be abandoned and replaced with a balancing approach founded directly on exclusionary rule policies: the proper question is whether the deterrence benefits of excluding live-wit-

---

*ed States v. Tane,* 329 F.2d 848, 853 (2d Cir. 1964) (testimony inadmissible where witness agreed to testify only after police revealed knowledge of facts gained from illegal tap) *with Brown v. United States,* 126 U.S.App.D.C. 134,. 139, 375 F.2d 310, 315, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967) (testimony admissible despite strong evidence that witness agreed to testify after promise of non-prosecution). *But see* notes 108–09 *infra.*

**30.** *See United States v. Marder,* 474 F.2d 1192, 1196 (5th Cir. 1973); *United States v. Evans,* 454 F.2d 813, 818 (8th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2423, 32 L.Ed.2d 668 (1972); *Williams v. United States,* 382 F.2d 48, 51 (5th Cir. 1967); *McLindon v. United States,* 117 U.S.App.D.C. 283, 286, 329 F.2d 238, 241 n.2 (1964).

**31.** See pp. ———— of 191 U.S.App.D.C., pp. 993–994 of 590 F.2d *infra.*

**32.** *See* pp. ———— of 191 U.S.App.D.C., pp. 995–997 of 590 F.2d *infra.*

**33.** Several courts have commented on the disparate judicial approaches to the exclusion of live-witness testimony. *E. g., United States v. Ceccolini,* 542 F.2d 136, 144 n.3 (2d Cir. 1976) (Van Graafeiland, J., dissenting); *United States v. Evans,* 454 F.2d 813, 818 (8th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2423, 32 L.Ed.2d 668 (1972).

Intra-circuit conflict is perhaps most evident in this Court, the results ranging from the views of the present Chief Justice Burger to those of former Chief Judge Bazelon. In *Smith and Bowden v. United States,* 117 U.S.App.D.C. 1, 324 F.2d 879 (1963), *cert. denied,* 377 U.S.

954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), Judge Burger propounded what amounted to a *per se* rule of attenuation in live-witness cases. *See id.* at 3, 4, 324 F.2d at 881, 882; *id.* at 6, 324 F.2d at 884 n.6 (Bazelon, C. J., dissenting) ("The majority would except the oral testimony of a 'living witness' from the 'fruit of the poisoned tree' doctrine, on the ground that a witness is an 'individual human personality' possessing 'attributes of will, perception, memory and volition.' "); *Brown v. United States,* 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 319, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967) (Burger, J., concurring) ("The critical aspect of *Smith-Bowden* is that live witnesses are not 'suppressed,' as inanimate objects may be. When an eyewitness is willing to give testimony, . . . he must be heard.") Subsequently, however, a different panel of this Court promulgated a "multiple factors," case-by-case approach. *See McLindon v. United States,* 117 U.S.App.D.C. 283, 286, 329 F.2d 238, 241 n.2 (1964), cited in notes 27–30 *supra; Edwards v. United States,* 117 U.S.App.D.C. 383, 385–386, 330 F.2d 849, 851–52 (1964) (apparently following *McLindon*). In *Smith and Anderson v. United States,* 120 U.S.App.D.C. 160, 344 F.2d 545 (1965), a third panel of this Court paid lip-service to the *McLindon* approach, while pronouncing what amounted to a rule of "but-for" causality. *See id.* at 162, 344 F.2d at 547 (Bazelon, C. J.) (live-witness testimony inadmissible, despite intervention of "several 'human personalities,' " because police "used" knowledge improperly obtained and witness would not have come forward "were it not for" police investigation).

ness testimony outweigh the social costs of such exclusion.

## III. INADEQUACY OF THE TRADITIONAL ANALYSIS

A. *Volition.* The most common inquiry in traditional attenuation analysis is whether the witness' testimony is "sufficiently an act of free will to purge the primary taint." The threshold objection to this inquiry is the impossibility of determining what, in any given case, in fact causes a witness to testify. In reaching a decision to testify, a witness inevitably operates under a complex of "pressures," some internally generated (desires to unburden guilt, to gain favor with authority, to be a good citizen), and some externally generated (threats of contempt, grants of immunity, promises of leniency). Psychological and philosophical uncertainties attending the concept of volition ill fit it as a tool of judicial analysis; to say that a statement should be suppressed as insufficiently a product of free will is simply to state the conclusion that the Government's contribution to the complex of factors producing the testimony is impermissible. Indeed, it was the unmanageability of inquiries into free will that led the Supreme Court to abandon a case-by-case analysis in the coerced-confession cases and embrace a prophylactic rule in *Miranda*.[34]

Precisely because the concept of volition is an uncertain tool of judicial analysis, it can be roundly manipulated by the courts. Some courts, for example, have found evidence of a witness' free will in the fact that he originally resisted testifying, but subsequently changed his mind—as the result, for example, of prosecutorial promises of leniency.[35] Other courts have concluded that a witness lacked free will on the basis of the same kind of evidence—pressures or inducements from the prosecution to testify.[36] One commentator has accordingly observed that the use of volitional concepts in

live-witness cases is "specious and unnecessary, and can be manipulated, whatever the facts or merits of the case, to justify any decision deemed a priori desirable."[37]

Most importantly, inquiry into a witness' free will is of scant logical relevance in determining whether "attenuation of the taint" has occurred. The courts, I believe, have unthinkingly imported this inquiry from cases like *Wong Sun* and *Brown*. Those cases were confession cases, and the confessions were made by the victims of illegal arrests. In order to ascertain whether the confessions were the fruit of illegality, it made sense to inquire whether the confessions were traceable to the lingering effects of improper detention, or whether they sprang from a truly independent source. If the confessions were sufficiently involuntary, in other words, that tended to show that they were the fruit of the poisonous tree. The situation is completely different when live-witness testimony is involved, because the live witness typically will not be the *victim* of the illegal search or arrest. If the witness' testimony is "involuntary," it will not be because the effects of the primal illegality linger and constrain his will, but because he fears prosecution or a contempt citation. Any "compulsion" on Thomas Massa, Jr., evidently, derives not from the taint of the illegal search, but from the judicial immunity order. If live-witness testimony is *ever* the fruit of the poisonous tree, that determination should be made as of the moment the witness takes the stand; whether he testifies because of an immunity order, a fear of prosecution, or a simple desire to tell the truth is irrelevant in gauging whether the "taint" is attenuated, for the "taint" existed in the distant past and never bore directly upon the witness anyway.

B. *Directness of Causation.* The second major inquiry in traditional attenuation analysis, likewise derived from *Wong Sun*,

---

34. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

35. *See* notes 108–09 *infra.*

36. *See* note 29 *supra.*

37. Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness,* 15 U.C.L.A.L.Rev. 32, 64 (1967).

is whether the witness' testimony represents an "exploitation" of the primary illegality. The threshold objection to this formula is its lack of precision. "To exploit" basically means simply "to use,"[38] and the police can be said to have exploited the primary illegality in any case where they would not have identified the witness but for the improper search. Yet the Supreme Court has consistently refused to embrace "but for" causality in fruit-of-the-poisonous-tree cases;[39] indeed, "but for" causality would make attenuation impossible. Any attempt to give "exploitation" a narrower sense than "use" reduces it to a pejorative term with no descriptive content; it prohibits the *improper* use of information without indicating what use is improper.

Efforts to discern "exploitation" by analyzing the "directness" of the casual link between the illegality and the testimony fare no better. Terms like "direct result," "proximate cause," and "intervening cause" do not advance analysis: judges in good faith will pick their adjectives according to the result they want to reach. Assessments of the number of "intervening events," with the implication that the taint becomes more attenuated as the investigation becomes more byzantine, likewise provide a field-day for judicial subjectivity. There is, moreover, little intellectual appeal in a rule which admits or excludes testimony in a criminal trial according to how nearly a police investigation resembles the plot of a cops-and-robbers movie.

The majority's analysis of this subject, with all respect, is a case in point. The majority finds no attenuation here because "The location of Massa was not the product of an improbable, unforeseeable coincidence. It was good police work, but a straightforward exploration of the leads in the Pharmacy file. . . . 'The road

. . . may be long, but it is straight.' "[40] Viewed from the vantage point of hindsight, of course, the road in almost every investigation will seem "long but straight"—policemen, for the most part, are rational investigators skilled in inductive science, who are accustomed, for all the majority's contempt, to explore leads in a "straightforward" manner. Reasoning like the majority's, which is common in live-witness cases,[41] amounts to nothing more than "but for" causality, and would preclude a finding of attenuation in any case.

## IV. THE SUPREME COURT'S BALANCING APPROACH

Because of these inadequacies, I believe that traditional attenuation analysis should not be used to ascertain on a case-by-case basis the admissibility of live-witness testimony. Yet the traditional analysis is not only inapposite and impracticable; it is also largely irrelevant to the policies the exclusionary rule is intended to serve. "The basic purpose of the rule," as Justice Powell said in *Brown,* "is to remove possible motivations for illegal arrests" and searches.[42] In view of this purpose, any rational invocation of the exclusionary rule in live-witness cases must focus on the motivations of the police at the time of the "primary illegality," for it is this primary illegality that is meant to be deterred. Traditional attenuation analysis, however, focuses not on the motivations of the police at the time of the illegal search or arrest, but on the events intervening *after* the original misconduct and on the state of mind of the *witness* at the end of the casual chain.

As a matter of logic, it is hard to see how application of a rule designed to control police behavior can be determined by an analysis that concerns itself exclusively with police behavior and witness motiva-

---

38. *See* Webster's New Collegiate Dictionary 404 (1973).

39. *See Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

40. Maj. op. at —— of 191 U.S.App.D.C., at 961 of 590 F.2d, *quoting United States v. Tane,* 329 F.2d 848, 853 (2d Cir. 1964).

41. *See* note 23 *supra.*

42. 422 U.S. at 610, 95 S.Ct. at 2265 (Powell, J., concurring in part).

tions *after the fact.*[43] A more rational approach, which concentrates directly on the policies underlying the exclusionary rule and on the motivations of the police at the critical time, has been consistently followed by the Supreme Court in its recent cases.

In these cases, the Court has established beyond peradventure that "the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.'"[44] "By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused."[45] The ex-

clusionary rule is not "a personal constitutional right of the party aggrieved,"[46] but a judicially-created remedy designed "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."[47]

"Despite its broad deterrent purpose," however, "the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons."[48] The Supreme Court has consistently recognized that "the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence."[49] Application of the

---

**43.** *See United States v. Guana-Sanchez,* 484 F.2d 590, 594 (7th Cir. 1973), *cert. dismissed as improvidently granted,* 420 U.S. 513, 95 S.Ct. 1344, 43 L.Ed.2d 361 (1975) (Pell, J., dissenting):

> I have some conceptual difficulty in determining how an exclusionary rule designed to control police behavior can be applied on a case-by-case basis as *Smith* [*and Anderson v. United States,* cited in note 33 *supra*] would have us do. I am certain that police officers would have an even greater difficulty in determining whether a possible witness's testimony was attenuated from illegality.

**44.** *United States v. Janis,* 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976), *quoting United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). *Accord, Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) ("The primary justification for the exclusionary rule . . . is the deterrence of police conduct that violates Fourth Amendment rights.") (citing cases). The Court occasionally has mentioned, as an alternative rationale for the exclusionary rule, "the imperative of judicial integrity." *E. g., United States v. Peltier,* 422 U.S. 531, 536–39, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). In the Court's more recent decisions, however, the "judicial integrity" rationale has been almost completely discarded. Taken to its logical extension, as Justice Powell pointed out in *Stone,* the "judicial integrity" rationale would dictate reversal of the Court's well-established doctrines on standing to object to admission of illegally-seized evidence, impeachment use of such evidence, and admissibility of such evidence absent objection by defendant. *See* 428 U.S. at 485, 96 S.Ct. 3037 (citing cases). Justice Blackmun pointed out in *Janis* that the "judicial integrity" inquiry in Fourth Amendment cases "is essentially the same as the in-

quiry into whether exclusion would serve a deterrent purpose," 428 U.S. at 458–59 n.35, 96 S.Ct. at 3034; and Justice Rehnquist noted in *Michigan v. Tucker* that the "judicial integrity" rationale "is really an assimilation of the more specific rationales" such as deterrence, "and does not in their absence provide an independent basis for excluding challenged evidence." 417 U.S. at 450 n.25, 94 S.Ct. at 2367. Concern with judicial integrity, in sum, "has limited force as a justification for the exclusion of highly probative evidence." *Stone,* 428 U.S. at 485, 96 S.Ct. at 3048 (footnote omitted).

**45.** *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

**46.** *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) (footnote omitted).

**47.** *Id.* at 347, 94 S.Ct. at 620, *quoting Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1457, 4 L.Ed.2d 1669 (1960). Whether the exclusionary rule is indeed "the only effectively available way" to deal with unconstitutional searches and seizures, of course, has become a matter of considerable doubt. The Court recently has acknowledged that the deterrent effect of the exclusionary rule is more an assumed hypothesis than a demonstrable fact. *See Stone v. Powell,* 428 U.S. at 492 & n.32, 96 S.Ct. 3037; *United States v. Janis,* 428 U.S. at 450–52 n.22, 96 S.Ct. 3021; *United States v. Calandra,* 414 U.S. at 348 n.5, 94 S.Ct. 613.

**48.** *Id.* at 348, 94 S.Ct. at 620. *See Stone v. Powell,* 428 U.S. at 486–87, 96 S.Ct. 3037.

**49.** *United States v. Janis,* 428 U.S. at 448–49, 96 S.Ct. at 3029. *Accord, Michigan v. Tucker,* 417 U.S. at 450, 94 S.Ct. 2357. The Court recognized the societal costs imposed by the exclusionary rule as early as *Nardone:*

rule "deflects the truthfinding process and often frees the guilty," [50] and "if applied indiscriminately . . . may well have the . . . effect of generating disrespect for the law and administration of justice." [51] As Justice Powell explained in *Stone,* "[t]he disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice." [52]

Cognizant both of the deterrence benefits and the social costs of invoking the exclusionary rule, therefore, the Court in its recent cases has adopted a balancing approach. Under this approach, the Court has proceeded "by weighing the utility of the exclusionary rule against the costs of extending it" to a given class of Fourth Amendment claims,[53] and has restricted the rule's application "to those areas where its remedial objectives are thought most efficaciously served." [54] When the rule's deterrent effect would not be "significantly augmented" [55] and the "additional marginal deterrence" it provides "does not outweigh the cost to society of extending" it; [56] when "imposition of the exclusionary rule . . . is unlikely to provide significant, must less substantial, additional deterrence; " [57] when its "incremental deterrent effect" is "uncertain at best" [58] and is outweighed by the "substantial societal costs" of its application,[59] the Court consistently has held that the rule does not apply.

In considering whether the exclusionary rule should be extended to cases of live-witness testimony, it is appropriate, I believe, to employ the same balancing approach that the Supreme Court used to consider extensions of the rule in *Calandra, Michigan v. Tucker, Janis,* and *Stone v. Powell.*[60] Indeed, the *Stone* Court specifically accommodated the "attenuation of the taint" doctrine to the balancing approach it em-

---

Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land.

308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

50. *Stone v. Powell,* 428 U.S. at 490, 96 S.Ct. at 3050.

51. *Id.* at 491, 96 S.Ct. at 3051 (footnote omitted).

52. *Id.* at 490, 96 S.Ct. at 3050 (footnote omitted).

53. *Id.* at 489, 96 S.Ct. at 3050.

54. *Id.* at 486–87, 96 S.Ct. at 3049, *citing United States v. Calandra,* 414 U.S. at 348, 94 S.Ct. 613.

55. *Michigan v. Tucker,* 417 U.S. at 448, 94 S.Ct. 2357.

56. *United States v. Janis,* 428 U.S. at 453–54, 96 S.Ct. at 3032.

57. *Id.* at 458, 96 S.Ct. at 3034.

58. *United States v. Calandra,* 414 U.S. at 351, 94 S.Ct. 613.

59. *Stone v. Powell,* 428 U.S. at 495, 96 S.Ct. 3037.

60. Several circuit courts have adopted a balancing approach in live-witness cases. In *Smith and Bowden v. United States,* 117 U.S. App.D.C. 1, 324 F.2d 879 (1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), Judge (now Chief Justice) Burger focused on the unique nature of live-witness testimony and concluded that in general there was "no rational basis" for excluding the testimony of an eyewitness to a crime. *See* note 33 *supra.* Judge Clark used a balancing approach in *Parker v. Estelle. See* 498 F.2d 625, 630 (5th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975) ("[W]e do not think it would serve the deterrent purpose of the exclusionary rule to deny to [defendant's] trial not merely the unlawful confession, but also truthful testimony from [a third-party witness]"). Judge Pell, dissenting in *United States v. Guana-Sanchez,* did the same. *See* 484 F.2d 590, 593 (7th Cir. 1973), *cert. dismissed as improvidently granted,* 420 U.S. 513, 95 S.Ct. 1344, 43 L.Ed.2d 361 (1975) ("[T]he rationale of the exclusionary rule . . . does not call for its extension to the point of excluding altogether an otherwise competent witness"). *Cf. United States v. Paepke,* 550 F.2d 385, 388–91 (7th Cir. 1977) (balancing deterrence benefits of exclusionary rule against risk of injury to tax-collection system and concluding that exclusionary rule does not prohibit use of illegally seized evidence in criminal prosecution for tax fraud committed after search) (citing *Scios* panel opinion).

ployed.[61] Concurring in *Brown,* moreover, Justice Powell emphasized that "the *Wong Sun* [attenuation] inquiry always should be conducted with the deterrent purpose of the . . . exclusionary rule sharply in focus," [62] and stated that "[t]he notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." [63]

## V. THE BALANCING APPROACH APPLIED TO LIVE–WITNESS TESTIMONY

Applying the Supreme Court's balancing approach to this case, the question is whether the deterrence benefits of extending the exclusionary rule to live-witness testimony justify the social costs of deflecting the truthfinding process of the criminal trial. Crucial to this cost/benefit analysis is a careful appreciation of the cognitive and volitional factors that distinguish live-witness testimony from physical evidence. As I have argued above, these cognitive and volitional factors are not relevant to an *ex post* determination of whether, on the facts of a particular case, the casual chain stemming from the original misconduct is "indirect." But they are highly relevant to an *ex ante* determination of whether, as a general rule, the police are likely to be deterred from misconduct by the exclusion of third-party testimony. On balance, I believe that the exclusion of live-witness testimony in general will provide significantly less deterrence and will impose significantly greater social costs than the exclusion of other types of evidentiary fruits.

A. *Deterrence Benefits.* Any estimate of the deterrence benefits of excluding live-witness testimony must focus on the motivations of the police prior to the "primal illegality." The extent to which a police officer has an incentive to conduct an illegal search depends, first, on his expectation that the search will uncover useful evidence and, second, on his assessment of the likelihood that what he might discover could be learned in other ways. In both respects, the trial testimony of witnesses differs importantly from physical evidence.

First, owing to the nature of testimonial evidence, the discovery of a potential witness' name is much less likely than the discovery of tangible objects to eventuate in useful evidence at trial. This is so because tangible evidence generally "speaks for itself," whereas, as Judge (now Chief Justice) Burger said in *Smith & Bowden v. United States,* [64]

[T]he living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.

Police officers, for example, reasonably could expect that if their search uncovers heroin, that evidence (but for the exclusionary rule) could be used effectively against the target of the search. But if they discover the name of someone who might have relevant information, they still face a long list of uncertainties before that name is translated into useful trial testimony. These include, but are not limited to: whether they can locate the individual; whether he will have useful information; whether he will divulge that information; whether he will remain available to testify at the time of trial; whether, if he is unwilling to testify, the prosecutor will be willing to grant him immunity; and whether, if all these uncertainties are favorably resolved, the jury will find him a credible witness. To these uncertainties must be added the awareness of experienced police

---

**61.** *See* 428 U.S. at 489 n.26, 96 S.Ct. 3037.

**62.** 422 U.S. at 612, 95 S.Ct. at 2266 (Powell, J., concurring in part).

**63.** *Id.* at 609, 95 S.Ct. at 2264.

**64.** 117 U.S.App.D.C. 1, 3–4, 324 F.2d 879, 881–82 (1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964) (footnotes omitted).

officers and prosecutors that witnesses often are reluctant to "get involved" in a criminal prosecution by disclosing information or testifying, either because of the inconvenience entailed, a general animus against law enforcement officers, the unpleasant prospect of exposure to hostile cross examination, or the risk of retaliation. In short, it is unlikely that, in the ordinary case, the possibility of finding a useful witness adds significantly to police incentives to conduct an unlawful search, or, conversely, that exclusion of such a witness' testimony would significantly augment the existing deterrence provided by the exclusion of other types of evidence and its fruits.[65]

Second, owing to the nature of testimonial evidence, it is almost always significantly more likely that a witness can or will be discovered in the normal course of investigation than that a comparably probative item of tangible evidence can or will be discovered. A witness, unlike tangible evidence, has the capacity to make himself known, and the greater the police expectation that a useful witness exists, the more likely it is that he will come forward. Identification of witnesses, moreover, is a normal subject of any investigation, and witnesses, unlike tangible evidence, can be sought out and interviewed without the necessity of a search—legal or illegal. As a general rule, therefore, the police have significantly less incentive to search for wit-

nesses by unlawful means than to search for other types of evidence by unlawful means.

Although exclusion of live-witness testimony undeniably would provide some "additional marginal deterrence,"[66] I conclude, for the reasons given above, that the "incremental deterrent effect . . . is uncertain at best."[67] In most instances of police misconduct, the exclusionary rule will mandate the suppression of tangible evidence, confessions, or both; the rule's deterrent effect rarely will be "significantly augmented"[68] by the exclusion of third-party witness testimony as well.

B. *Social Costs.* Whatever "incremental deterrent effect" exclusion of live-witness testimony would provide is outweighed by the substantial social costs such exclusion would impose. The Supreme Court has often stressed the deleterious impact of the exclusion of probative evidence on society's ability to enforce the law.[69] In the case of live-witness testimony this impact is especially severe. Tangible evidence and verbal confessions, which speak for themselves, have a finite scope. Exclusion, though critical to the outcome of some cases, thus has a relatively limited impact that in some sense may be deemed "proportionate" to the official wrong.[70] To disable a witness and all he may know about a defendant's prior criminal activities, even though the

65. There are two extraordinary types of cases in which exclusion of a witness' testimony *is* necessary to deter police misconduct. The first is where the police engage in unlawful acts for the specific purpose of discovering potentially useful witnesses. *See* p. —— of 191 U.S.App. D.C., p. 991 of 590 F.2d *infra.* The second is where the witness' testimony (*e. g.,* the testimony of a police officer who participated in an illegal search) *describes* illegally seized evidence or otherwise inadmissible fruits. The deterrence principle obviously would be emasculated if the prosecution could use a willing witness to describe tainted evidence, and under established exclusionary rule doctrine such testimony is inadmissible. My analysis and conclusions are confined to the ordinary cases of live-witness testimony—the types of cases with which the circuit court opinions cited above have uniformly been concerned—in which the witness' testimony derives from knowledge he

possesses *independently* of any illegal police conduct.

66. *United States v. Janis,* 428 U.S. at 453, 96 S.Ct. 3021.

67. *United States v. Calandra,* 414 U.S. at 351, 94 S.Ct. at 621.

68. *Michigan v. Tucker,* 417 U.S. at 448, 94 S.Ct. 2357.

69. *See* pp. ———— of 191 U.S.App.D.C., pp. 987–988 of 590 F.2d *supra.*

70. In *Stone,* Justice Powell stressed the important role played by proportionality in criminal justice. *See* 428 U.S. at 490–91 & n. 29, 96 S.Ct. 3037, *quoted* at p. —— of 191 U.S.App. D.C., p. 988 of 590 F.2d *supra.*

witness' identity and the knowledge he possesses are totally unrelated both to the purpose of the search and the evidence discovered by the search, would usually impose a cost far out of proportion to the infraction that exclusion is meant to deter.[71]

The social costs of excluding live-witness testimony, moreover, appear in a particularly stark form, for they are less mitigated by countervailing social benefits from vindicating defendants' privacy interests. Individuals, of course, have a constitutionally recognized expectation of privacy in their persons, houses, and effects. The introduction of illegally seized evidence frequently will entail a renewed invasion of their privacy.[72] Individuals, however, ordinarily have no recognized privacy interest in information disclosed by them to or otherwise possessed by third parties.[73] A third party's testimony at trial, therefore, rarely will trench upon the defendant's privacy interests, since if it is admissible at all that testimony will concern matters known to the witness wholly independently of any illegal invasion.[74]

For these reasons, I believe that the social costs of excluding live-witness testimony will almost invariably outweigh the incremental deterrent effect that invocation of the exclusionary rule would produce. This cost/benefit analysis might well come out differently if the police were shown to have acted unlawfully for the specific purpose of discovering potentially useful witnesses.[75] Since there is no suggestion of such police motivation in this case, I conclude that the general rule applies, and that Thomas Massa, Jr., should testify.

## VI.

On 21 March 1978, shortly before our *en banc* opinions herein were scheduled to issue, the Supreme Court handed down its decision in *United States v. Ceccolini.*[76] Writing for the Court in that case, Justice Rehnquist held that the testimony of a live witness should not have been suppressed as the fruit of the poisonous tree, notwithstanding that her testimony was the indirect product of an illegal search. This holding was predicated on the Court's conclusion that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support

71. The path of the law, of course, has headed unerringly toward unrestricted admission of relevant testimony. *See* McCormick's Evidence § 71 at 150 (2d ed. E. Cleary 1972):

> The rules which disqualify witnesses who have knowledge of relevant facts and mental capacity to convey that knowledge are serious obstructions to the ascertainment of truth. For a century the course of legal evolution has been in the direction of sweeping away these obstructions.

*See Brown v. United States,* 126 U.S.App.D.C. 134, 143, 375 F.2d 310, 319, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967) (Burger, J., concurring), *quoted in* note 33 *supra.*

72. It is on this principle, for example, that 18 U.S.C. §§ 2510–2520 (1976), regulating electronic surveillance, prohibit not only unauthorized interception of communications but equally their subsequent disclosure.

73. *See, e. g., United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (depositor has no Fourth Amendment interest in bank records relating to his accounts); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34

L.Ed.2d 548 (1973) (taxpayer has no Fourth or Fifth Amendment interest in financial records surrendered to accountant); *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (defendant has no Fourth Amendment interest in statements overheard by informer who was "wired for sound").

74. Testimony concerning matters known to a witness by virtue of illegal police activity, such as testimony describing objects illegally seized, is inadmissible. *See* note 65 *supra.*

75. Such a case is probably illustrated by *United States v. Karanthos,* 531 F.2d 26 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). An affidavit supporting the search warrant in that case revealed that federal agents searched a restaurant for the specific purpose of discovering illegal aliens, *id.* at 28–29; the Government subsequently sought to use the aliens' testimony against the restaurant owner.

76. 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

suppression of an inanimate object."[77] This conclusion obviously strengthens our position that the testimony of Thomas Massa, Jr., should not be suppressed here.

The reasoning we initially followed in our *en banc* dissent to reach this result rested both on the *per se* rationale of the Chief Justice's concurrence and on the traditional attenuation analysis of the *Ceccolini* majority. Our original, unanimous panel opinion rested only on the latter. Our analysis of the factors producing attenuation of the taint here, as they produced it in *Ceccolini,* has been removed from the earlier portion of this opinion and rewritten to take the Supreme Court's latest position into account. But first we refer to the view of the Chief Justice.

In his concurrence the Chief Justice balanced the high cost to society of losing a competent witness "against the prospect of incrementally enhancing Fourth Amendment values," and concluded that, in general, "the permanent silencing of a witness . . . is not worth the high price the exclusionary rule exacts."[78] The Chief Justice accordingly advocated a *per se* approach to the admissibility of live-witness testimony: "such testimony," he concluded, "is always admissible," except perhaps in the most unusual circumstances.[79] We believe that the Chief Justice's opinion, particularly its exposition of the perils attending judicial inquiries into witnesses' voluntariness, is sound, and that it eventually may prove to represent the best and most workable solution to the vexed "tainted witness" problem.

The *Ceccolini* majority, while echoing the concerns voiced by the Chief Justice, adopted a narrower approach. Rejecting *Wong Sun's* suggestion that there is no "logical distinction between physical and verbal evidence,"[80] the majority noted that the social costs of excluding live-witness testimony will generally be greater, and that the deterrence benefits of excluding it will often be less, than in the case of tangible evidence.[81] Yet while the majority agreed that a balancing of these costs and benefits "must play a factor in the attenuation analysis,"[82] it declined to hold that this balancing process yielded a *per se* rule that live-witness testimony is in general admissible. Rather than abandon "traditional attenuation analysis," the majority determined to *accommodate* it to "the differences between live-witness testimony and inanimate evidence"[83] by insisting that the attenuation inquiry be conducted rigorously. "[S]ince the cost of excluding live-witness testimony often will be greater," the Court concluded, "a closer, more direct link between the illegality and that kind of testimony is required."[84]

The approach that the Court adopted in *Ceccolini* differs significantly from the approach it adopted in *Calandra, Janis,* and *Stone v. Powell.* In those cases, the Court balanced the costs and benefits of the exclusionary rule "once and for all" and concluded that the rule generally should not apply in a given class of cases. The *Ceccolini* majority, by contrast, directed that the balancing should be done on a case-by-case basis, within the framework of traditional (albeit more rigorous) multifactor attenua-

**77.** *Id.* at 280, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

**78.** *Id.* at 285, 98 S.Ct. at 1064–65, 55 L.Ed.2d at 282–83 (Burger, C. J., concurring in the judgment).

**79.** *Id.* at 285, 98 S.Ct. at 1065, 55 L.Ed.2d at 283. The Chief Justice suggested that the *per se* rule might admit of an exception where police officers were shown to have searched for the specific purpose of discovering witnesses. *See id.* at 284, 98 S.Ct. at 1064 & n. 4, 55 L.Ed.2d at 292 & n. 4; *cf.* p. —— of 191 U.S. App.D.C., p. 991 of 590 F.2d & note 75 *supra.*

**80.** 435 U.S. at 275, 98 S.Ct. at 1059, 55 L.Ed.2d at 276, *quoting* 371 U.S. at 486, 83 S.Ct. 407.

**81.** 435 U.S. at 275, 276, 98 S.Ct. at 1060–61, 55 L.Ed.2d at 277–78.

**82.** *Id.* at 279, 98 S.Ct. at 1061, 55 L.Ed.2d at 279.

**83.** *Id.,* at 278, 98 S.Ct. at 1061, 55 L.Ed.2d at 278.

**84.** *Id.,* at 278, 98 S.Ct. at 1061, 55 L.Ed.2d at 278.

tion analysis. Justice Rehnquist mentioned five factors arising from the circumstances of that case which pointed to the conclusion that the witness' testimony should not have been suppressed. These factors largely overlap the three factors listed by Justice Blackmun as relevant to a finding of attenuation in *Brown v. Illinois,* a decision that *Ceccolini* approved.[85] Mindful of Justice Rehnquist's warning that "no mathematical weight can be assigned to any of [these] factors," and mindful, too, of his injunction that "the exclusionary rule should be invoked with much greater reluctance" in live-witness cases,[86] we conclude that, while on the factors specifically cited in *Ceccolini* this case is arguably closer than that one, certainly in *Scios* on all the relevant factors sufficient attenuation has occurred to make Massa's testimony admissible.

Two of the factors mentioned by Justice Rehnquist as pointing to attenuation in *Ceccolini* are absent from this case.[87] More important than their absence, however, is the presence here of the other attenuating factors cited in *Ceccolini* and *Brown v. Illinois:* the lapse of a substantial period of time; the presence of significant intervening circumstances; the non-flagrant nature of the original search; and the degree of volition exercised by the witness.

First, as Justice Blackmun in *Brown* had cited "[t]he temporal proximity of the arrest and the confession"[88] as relevant in assessing attenuation, so Justice Rehnquist in *Ceccolini* adverted to the "[s]ubstantial periods of time" that had elapsed between the improper search and the witness' testi-

mony.[89] In the present case, nearly three months passed between the search of the file folder and the Government's initial contact with Massa. This surely is comparable to the four-month period in *Ceccolini*. In assessing temporal proximity, moreover, as well as in assessing the second attenuating factor of "intervening circumstances," it is essential to remember Justice Rehnquist's clear words: "[A]n examination of our cases persuades us that the Court of Appeals was simply wrong in concluding that if the road were uninterrupted, its length was immaterial. Its length, we hold, *is* material . . .."[90]

Second, the Court in *Brown* cited "the presence of intervening circumstances" as a relevant factor in determining attenuation. In this case, the following events intervened between the FBI's search and Massa's testimony before the grand jury: (1) the FBI unsuccessfully contacted the motel desk clerk and bookkeeper; (2) the FBI discovered a list of telephone calls made from the motel room; (3) subscribers to the phones were identified, including Thomas Massa; (4) the FBI contacted Massa's family, and learned that Thomas Massa, Jr., in whom they were interested, was not available; (5) Massa consulted his family and his lawyer; (6) Massa went to Washington, spoke to a U. S. Attorney, and made an off-the-record proffer; (7) Massa consulted a Washington lawyer; (8) the court entered an order granting Massa immunity from prosecution.

Perhaps the most important "intervening event" is the last, which establishes a close nexus between this case and Justice White's

---

85. *Id.,* at 276, 98 S.Ct. at 1060, 55 L.Ed.2d at 277, *citing* 422 U.S. at 603, 95 S.Ct. 2254.

86. 435 U.S. at 280, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

87. Some of the evidence improperly seized from the file folder apparently was used in questioning Massa, whereas the illegally seized evidence was not used in questioning the witness in *Ceccolini*. *See,* 435 U.S. at 279, 98 S.Ct. at 1062, 55 L.Ed.2d at 279. Neither Massa's identity nor his relationship with Scios was known to the FBI before the search, whereas "both the identity of [the witness] and her relationship with the respondent [were] well known to" the investigators in *Ceccolini*. *See*

id., at 279, 98 S.Ct. at 1062, 55 L.Ed.2d at 279. It is unclear how much weight the Court meant to accord this latter factor, since it accepted the findings of both lower courts that "the ongoing investigation would not have inevitably led" to discovery of the witness in question. *See id.,* at 273, 98 S.Ct. at 1058, 55 L.Ed.2d at 275.

88. 422 U.S. at 603, 95 S.Ct. at 2261.

89. 435 U.S. at 279, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

90. *Id.,* at 275, 98 S.Ct. at 1059, 55 L.Ed.2d at 276 (emphasis original).

opinion in *Johnson v. Louisiana*.[91] In *Johnson* appellant claimed that his identification in a line-up should be excluded as the fruit of an illegal arrest. The Court rejected this argument. It pointed out that prior to the line-up Johnson had been brought before a committing magistrate to advise him of his rights and set bail. Consequently, at the time of the line-up, Johnson's detention was under the authority of this commitment, and the line-up was conducted not by exploitation of the challenged arrest but " 'by means sufficiently distinguishable to be purged of the primary taint.' "[92] Similarly, when Massa testified before the grand jury under a grant of immunity, he was testifying under the authority of the immunity papers signed by the district judge. His testimony was thus not an exploitation of the illegal search but the product of the immunity order, a means "sufficiently distinguishable to be purged of the primary taint." The relevance of *Johnson* to this case is established beyond peradventure by *Brown v. Illinois*. In citing "the presence of intervening circumstances" as one factor relevant to finding of attenuation, *Brown* cited *Johnson*.[93]

A third factor, described in *Brown* as of particular relevance in gauging attenuation, is "the purpose and flagrancy of the official misconduct."[94] In *Ceccolini*, similarly, the Court concluded that application of the exclusionary rule "could not have the slightest deterrent effect" because there was no evidence to suggest that the officer made the search "with the intent of finding [useful] tangible evidence . . ., much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness.

. . . ."[95] In the present case, the FBI agents undeniably searched with the intent of finding evidence (or weapons) relevant to their investigation of Scios, since they purportedly made their search as incident to his arrest. But there is no suggestion here, as there was none *Ceccolini*, that the officers searched with the intent of discovering *witnesses*. It seems unlikely, therefore, that suppression of Massa's testimony would enhance the deterrence already flowing from the exclusion of the tangible evidence and its fruits.

Of even greater importance in this case, given *Brown*, is the non-flagrant nature of the original search. "The deterrent purpose of the exclusionary rule," Justice Rehnquist wrote in *Michigan v. Tucker*, "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right."[96] "In cases in which this underlying premise is lacking," Justice Powell wrote concurring in *Brown*, "the deterrence rationale of the exclusionary rule does not obtain, and [there is] no legitimate justification for depriving the prosecution of reliable and probative evidence."[97] The behavior of the FBI agents in this case was hardly egregious. When they arrested Scios, they seized a file folder from the top of a credenza a few feet behind him. It seems undisputed that the file folder was within the "grabbing distance" defined by the Supreme Court in *Chimel v. California*[98] as the spatial limit to a valid search incident to arrest. The search would thus have been perfectly proper, were it not for the fortuity that an agent happened to be standing between Scios and the credenza. The folder, surely,

**91.** 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972).

**92.** *Id.* at 365, 92 S.Ct. at 1626, *quoting Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**93.** 422 U.S. at 603–04, 95 S.Ct. 2254, *citing* 406 U.S. at 365, 92 S.Ct. 1620.

**94.** 422 U.S. at 604, 95 S.Ct. at 2262 (footnote omitted).

**95.** 435 U.S. at 280, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

**96.** 417 U.S. at 447, 94 S.Ct. at 2365.

**97.** 422 U.S. at 612, 95 S.Ct. at 2266 (Powell, J., concurring in part).

**98.** 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (valid search incident to arrest limited to area "within the immediate control" of arrestee).

was something a reasonable officer in good faith could have thought he had a right to seize. Indeed, as one of the agents admitted, they were unsure if they could properly seize the file folder and did so only after discussing the matter among themselves.[99] This evidently was what Justice Powell has called a "technical" violation of the Fourth Amendment,[100] and is a case in which invocation of the exclusionary rule is unlikely to serve any deterrent purpose whatsoever.

Nor can it be argued that the agents' good faith can be attributed only to "ignorance of the law." The agents, obviously, were chargeable with knowledge of the *Chimel* rule; the point is that there was room for argument as to whether the *Chimel* rule interdicted a search on the facts of this case. Uncertainty as to the law's fine lines, surely, is a plague that undoubtedly besets many law enforcement officers—a result that is not surprising in view of the tortured path our search-and-seizure law has followed. The FBI agents here treated Scios throughout with courtesy; they conducted no general search; and before seizing the file folder they had the presence of mind to discuss the propriety of the seizure in calm and reasoned terms. The agents, in short, behaved very much as we should like law enforcement officers to behave. Their behavior was in no sense egregious, and their decision to seize the folder, while not the decision some courts would have reached, was plainly not reached thoughtlessly or in bad faith. My point is simply that in these circumstances the exclusionary rule is of scant deterrent value—and this simple point is what this and other attenuation cases are all about.

A fourth factor, common in traditional attenuation analysis and central to *Brown,* is the degree to which verbal evidence represents the uncoerced product of the speaker's will. The majority in *Ceccolini* likewise concluded that "the degree of free will exercised by the witness is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application,"[101] and held the testimony admissible in part because it was demonstrably "an act of [the witness'] own free will in no way coerced or even induced by official authority . . .."[102] The testimony at issue in this case, I believe, was quite clearly *voluntary.* The record reveals at least four clear-cut acts of volition on Massa's part: (1) he consulted his family, who tried to persuade him to speak with the prosecutor; (2) he consulted his lawyer, who advised him to say nothing without a grant of immunity; (3) he went to Washington and made an off-the-record proffer of his proposed testimony after being told that a grant of immunity was imminent; (4) he retained new counsel and testified under the immunity order. The totality of these circumstances shows a reflective man seeking advice, pondering in advance the consequences of his action and the testimony he would give, exercising his free will in giving the prosecutor certain information, and finally testifying, on the advice of his lawyer, with judicial immunity. Massa changed his mind about testifying, it is true, but this very circumstance has consistently been cited by the courts as evidence of voluntariness sufficient to cause attenuation.[103] At least one other court, moreover, has cited a witness' consultation of his lawyer as evidence of volition leading to a finding of attenuation.[104]

---

**99.** Tr. II 30–31.

**100.** *See Brown v. Illinois,* 422 U.S. at 610–11, 95 S.Ct. 2254 (Powell, J., concurring in part).

**101.** 435 U.S. at 276, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

**102.** *Id.* at 279, 98 S.Ct. 1062, 55 L.Ed.2d at 279.

**103.** *See* p. —— of 191 U.S.App.D.C., p. 983 of 590 F.2d & note 26 *supra.*

**104.** *See Parker v. Estelle,* 498 F.2d 625, 630 (5th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). *Cf. United States v. Paepke,* 550 F.2d 385, 390 (7th Cir. 1977) (defendant's consultation of lawyer regarding tax returns purges taint of illegal search, allowing illegally seized evidence to be used in criminal prosecution for tax fraud committed after search) (*citing Scios* panel opinion).

The majority argues that it is more difficult to show attenuation here than in *Ceccolini* because "official authority" may here be said to have *induced* Massa to testify. But the majority is simply wrong in saying that the judicial immunity order rendered Massa's testimony "purely and simply a product of *coercion.*" [105] The Fifth Circuit recently has held (in a pre-*Ceccolini* case) that a witness' testimony was voluntary, and hence that any taint affecting it had become attenuated, where the witness testified under a grant of use immunity.[106] A number of courts have held that testimony was the product of a witness' free will, with a consequent finding of attenuation, where the witness testified in response to a promise of leniency or non-prosecution.[107] Courts almost unanimously have found testimony of accessories "sufficiently a product of free will" to cause attenuation; although the opinions do not state what promises were made to these witnesses, it seems likely that they testified in response to *some* prosecutorial inducements.[108] The immunity order in this case undoubtedly offered Massa an *inducement* to testify. But it did not therefore *coerce* him: it was but one factor in his cost/benefit analysis, one event in the long chain of volitional events that produced the testimony he ultimately gave. And whatever the impact of the immunity order in Massa's thinking, it cannot be doubted that here, at least, in *Ceccolini's* words "*the illegality which led to the discovery of the witness* [did] not play

any meaningful part in [his] willingness to testify."[109]

From my discussion of these four attenuating factors, it is obvious that I do not regard *Scios* and *Ceccolini* as fitting hand in glove. Several of the factors pointing to Justice Rehnquist's conclusion are absent, or are present in less convincing guise, here. Yet the Court cautioned against assigning the factors it discussed any "mathematical weight," and precisely because *Ceccolini* was an easy case, subsequent cases cannot be expected to be decided within its facts. Nor, indeed, can we expect to decide many of these live-witness attenuation cases within the facts of previous decisions. The combination of circumstances has already proved to be infinite, so much so that the Supreme Court's enumeration of relevant factors as guidelines in assessing attenuation on a case-by-case basis shows such variance (compare Justice Blackmun in *Brown* with Justice Rehnquist in *Ceccolini,* the factors cited as relevant obviously being inspired by the case at hand). This lends weight to the Chief Justice's sponsorship of a *per se* rule in all but the most unusual live-witness cases. But since the Supreme Court majority has held that attenuation should be examined on a case-by-case basis, and analyzed with reference to factors relevant in each particular case, analysis of the circumstances of Massa's live testimony in Scios' case persuades me that, on all the precedents, there has been attenuation of

**105.** Maj. op. at —— of 191 U.S.App.D.C., at 961 of 590 F.2d (emphasis added).

**106.** *United States v. Houltin,* 566 F.2d 1027, 1031–32 (5th Cir. 1978) (alternate holding).

**107.** *See Brown v. United States,* 126 U.S.App. D.C. 134, 139, 375 F.2d 310, 315, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967) (strong evidence that witness agreed to testify after promise of non-prosecution); *United States v. Beasley,* 485 F.2d 60, 64 (10th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 292 (1974) ("[W]hen the testimony of an accessory is used there would often exist grounds for ruling that the giving of the testimony results from the accessory's desire to help himself or herself. Thus, the exercise of human volition intervenes and it is not the product of the unlawful arrest.").

**108.** *See United States v. Marder,* 474 F.2d 1192, 1197 n. 6 (5th Cir. 1973); *United States v. Evans,* 454 F.2d 813, 819 (8th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2423, 32 L.Ed.2d 668 (1972); *United States v. Hoffman,* 385 F.2d 501, 504 (7th Cir. 1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968); *Edwards v. United States,* 117 U.S.App.D.C. 383, 384, 330 F.2d 849, 850 (1964); *Smith and Bowden v. United States,* 117 U.S.App.D.C. 1, 2, 3, 324 F.2d 879, 880, 881 (1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964).

**109.** 435 U.S. at 277, 98 S.Ct. at 1060, 55 L.Ed.2d at 277 (emphasis added).

any possible taint. There is no justification for suppression. The course of justice calls for the witness to be heard. I therefore must respectfully dissent.